**The STATE of Ohio, Appellee,**

v.

**GAUL, Appellant.** █

[Cite as *State v. Gaul* (1997), 117 Ohio App.3d 839.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 70131.

Decided March 31, 1997.

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, *Ronald K. Riley, David Hildebrand* and *Cathie T. Chancellor,* Assistant Prosecuting Attorneys, for appellee.

*Berkman, Gordon, Murray & DeVan, Mark R. DeVan* and *Steven D. Shafron,* for appellant.

---

MILLIGAN, Judge.

We reverse the criminal conviction of the defendant-appellant, Francis E. Gaul, the Treasurer of Cuyahoga County.

We hold that Gaul cannot be convicted of the crime of dereliction in his official duties because (1) the county prosecutor has not charged him with violating statutes making his alleged mismanagement a crime, and (2) the state did not produce any evidence that Gaul failed to safekeep documents evidencing certain risky investments.

We do not suggest that Gaul is blameless in failing to supervise improvident investment activities of his subordinates. The issue here is not whether the treasurer is civilly liable for the $115 million of public money his deputy treasurers lost in the declining bond market of 1993 to 1994. Ironically, the very sections of the Ohio Revised Code used to prosecute Gaul as a criminal spell out the parameters of civil legal liability.

## I. Background

Before 1986, all moneys belonging to Cuyahoga County were held by its treasurer in bank accounts where they earned little or no interest. In 1986, the Board of Commissioners of Cuyahoga County decided to take advantage of certain provisions of the Uniform Depositary Act, R.C. 135.01 *et seq.*, which grant the treasurer authority to place inactive county money in other investments earning greater returns than simple bank accounts. R.C. 135.35(A)(1) through (5) and (B). The board created an Investment Advisory Committee pursuant to R.C. 135.341 consisting of two commissioners and the treasurer, Francis E. Gaul. This committee enacted the Accountability, Business Practices and Concerns for Public Trust ("ABC") program, which changed the county's formerly passive investment strategy to a more aggressive policy. Between 1986 and 1991, the ABC program enjoyed phenomenal success, reaping approximately $460,000,000 in profits over the period.

In 1991, the investment committee decided to expand the ABC program to allow other governmental entities to participate. The goal was to further maximize profits by pooling capital from surrounding communities. In June, it created the Secured Assets Fund Earnings ("SAFE") program.

As the acronym suggests, the program was intended to provide a relatively secure investment fund in which public entities could place inactive funds without worrying about losing principal. Cuyahoga County guaranteed all investments against loss. Additionally, the investment committee promulgated procedural manuals containing policies focused on controlling risk. For example, the fund could not invest in the full range of securities allowed by statute, but only in higher quality securities, such as United States Treasury and Agency bonds, which are backed by the full faith and credit of the federal government and pose virtually no risk that the investor will lose principal. Also, all moneys deposited were to be invested according to a strict maturity ratio: forty percent of the deposits in short-term securities, forty percent in medium-term securities, and twenty percent in long-term securities. It was intended that the securities would merely be held to maturity, and the ratio was designed to ensure that the fund had enough cash to meet demands for withdrawals[1] and for other short-term needs.

To implement the anticipated trading, the treasurer created an investment department composed of eleven individuals. Six persons actively executed trades while five others acted as liaisons between SAFE and any local governmental subdivisions choosing to participate in the fund. The department was managed by Timothy Simmerly, who reported directly to Gaul. In the normal course of

---

1. See R.C. 135.351(B).

business, the investment office prepared daily activity reports of all trades, and provided the county auditor with a yearly report detailing the entire portfolio.

The security measures and the county's earnings history convinced as many as seventy cities, school districts and special districts, as well as Summit and Lorain Counties, to invest their inactive funds in the SAFE program.

Two types of investments authorized by R.C. 135.35(B) are complicated transactions called repurchase and reverse-repurchase agreements.

"A repurchase agreement transaction, or repo, as it is commonly referred to, is a short-term investment vehicle that can be used for cash management purposes by an institutional investor. The repo is a hybrid loan/sale transaction that centers around the sale of long-term financial instruments * * *, either on a demand basis, or at the end of a fixed (generally short) term. The long-term financial instruments which are used in the repo generally consist of U.S. Treasury securities, commercial paper, corporate securities, or whole loan mortgages.

"In each repo transaction, one party is a provider, and one party is a user, of funds. The provider of funds (hereinafter 'Buyer') enters into a contract with a user of funds (hereinafter 'Seller'), whereby the Buyer purchases agreed-upon financial instruments, while the Seller simultaneously agrees to buy back the financial instruments at a specified date, or on the buyer's demand, for a price exceeding the purchase price. The additional amount received by the Buyer upon resale of the financial instruments reflects the accrued interest which is earned on the transaction. From the perspective of the Seller, the transaction is referred to as a 'repo', whereas from the perspective of the Buyer, the transaction is referred to as a 'reverse repo.'" Spielman, Whole Loan Repurchase Agreements: An Assessment of Investment Transaction Risk in Light of Continuing Legal Uncertainty (1994), 99 Commercial L.J. 476, 476–477.

In essence, the county "sold" existing bonds to other institutional investors, thereby obtaining cash, and agreed to repurchase the bonds at a specified date for a price slightly higher than the original sale price. The net effect of the transaction is that the county temporarily transferred bonds to another institution in exchange for a short-term loan at a fixed interest rate, which is really borrowing money against existing assets that were pledged to secure the loan.[2] The county could then use the proceeds to finance other bond purchases. If all

---

2. Repurchase agreements have been characterized as secured or collateralized loans. See *United States v. Erickson* (C.A.7, 1979), 601 F.2d 296, 300, fn. 4; *Securities Exchange Comm. v. Miller* (S.D.N.Y.1980), 495 F.Supp. 465, 467; Schatz, The Characterization of Repurchase Agreements in the Context of Federal Securities Laws (1987), 61 St. John's L.Rev. 290, 295–296.

went well, the county earned a higher interest rate on the interim investments than it had to pay under the repurchase agreement, thereby showing a profit.

These repurchase agreements, which were authorized by the county's investment manual, were approved by the Cuyahoga County Prosecutor, independent bond counsel, and the county advisory committee.

By using these and other investment techniques,[3] the SAFE program continued to earn tremendous amounts of money, boasting profits in excess of $400,-000,000 at one point.

Some time in 1987, Simmerly asked the county auditor's accountant for advice on how to report repurchase agreements that had not been settled by year's end. He apparently placed them in an inappropriate account. The accountant told Simmerly that the repurchase transactions should not be recorded in that particular account; unfortunately, Simmerly misunderstood this remark and directed the investment department to leave all repurchase agreements off the balance sheet. Until 1993, those accounts were listed in year-end financial statements submitted to the state auditor, but did not appear on daily reports compiled by Simmerly's staff.

In 1993, a booming national economy threatened to spur inflation, so the Federal Reserve Bank increased interest rates to slow economic growth. As a result of these interest rate increases, bond prices fell.[4] Disregarding a requirement in R.C. 135.14 that certain governmental subdivisions (for example, school boards) must limit investments in securities to those securities having a duration

---

3.  Fund managers mismatched the maturities of fund assets and liabilities. Moneys needed for short-term cash flow and proceeds from overnight borrowing were used to buy long-term notes and bonds, which carried greater interest rates. When there was a demand for cash, as when an investor sought to withdraw funds, or when short-term loan payments came due, the fund managers were forced to either borrow more money or run the risk of selling the longer-term securities at a loss. The tactic, in a bull market, produces impressive earnings, but it does so by multiplying risk.

Also, they regularly conducted trades on a "corporate" settlement basis, meaning that purchase and sales of securities were not concluded until five days after the buy/sell order. During the interim, the fund managers conducted "pair-off" transactions, where they continued to buy and sell the securities during the settlement period. If interest rates fell, the security held during the settlement period would increase in value, and the gains were recorded in the portfolio. This tactic increases returns in a bull market, but at the risk of losing money if interest rates rise, thereby causing the values of securities held during the settlement period to fall.

4.  Interest rates drive bond prices. Generally, as interest rates drop, bond prices increase, and vice versa. This is due to the cost of borrowing money—when interest rates increase, borrowers can realize a greater return on their investments on straight passbook money accounts. Consequently, bond prices must fall in order to remain competitive with straight money account rates. When interest rates decline, borrowers can realize greater returns on investments in the market rather than in passbook accounts. The influx of buyers into the market increases demand, and bond prices rise accordingly.

of less than two years, SAFE managers began placing more money in unstable, long-term bonds with hopes of recouping losses. This increased trading in long-term bonds greatly increased the risk factor in the fund.[5]

In September 1993, SAFE "sold" $185 million in large blocks of bonds under written repurchase agreements. Initially, the arrangement generated about $3.7 million for the fund from the difference in interest rates. However, as interest rates increased and the value of the bonds held by the brokers fell, the fund had to pledge more and more money to maintain the bonds held as collateral.[6] By early 1994, when the fund retook possession of the bonds, it had spent more than $9 million to prop up their value, making the deal a net loss.

As losses mounted, the fund became vulnerable to collateral calls from lenders holding the fund's currently losing bonds. Fund managers began to pledge other assets that were likewise in a losing position. Simmerly and the investment department hoped that the bond market would recover, thus enabling the county to meet its obligations under both the leveraged assets and the principal. Unfortunately, the market worsened and the fund resorted to continued leveraging, at one point having leveraged its assets by a three-to-one ratio. In this respect, the SAFE managers acted like compulsive gamblers—continually throwing good money after bad with the thought that their luck would change at any moment.

Despite mounting losses, none of the repurchase agreements were listed on the fund's balance sheet or financial statements. During 1993, SAFE had a total

---

5. The risk factor for bonds is expressed by an index that tracks the decline in value of a bond based upon the rise in interest rates and the duration of the particular bond. A risk index of zero indicates that the investment is risk-free, that rising interest rates will not decrease the value of the investment. A risk index of one indicates that, for every point of increase in interest rates, the value of the portfolio would decrease by one percent. An acceptable risk index for a governmental investment fund would be three or four. By mid–1993, the SAFE fund carried a risk index of twenty-eight, meaning that every one-point rise in interest rates would force a twenty-eight percent decline in the value of the fund's assets.

6. As explained by Judge Cannella in *Miller, supra*, 495 F.Supp. at 469–470, fn. 2:

"Repos * * * customarily give added protection to the lender [the 'purchaser' of the securities] against fluctuation in the value of the collateral, by providing a margin, that is, a spread between the value of the collateral and the amount of the loan. In other words, the lender will usually demand as collateral securities that are worth more than the amount of the loan.

"For repos that last longer than a day, the lender may receive even further protection. 'Term repos,' which are those for a definite period longer than a day, and 'open' repos, which are indefinite and may be terminated by either party on demand, customarily give the lender a right to demand additional collateral if the value of the original collateral declines significantly. In the event the borrower [the 'seller' of the securities] fails to honor such a demand, the lender may unilaterally terminate the agreement, sell the collateral on the open market, and hold the borrower liable for any difference between the amount of the loan plus interest and the recovery from the sale."

balance of $1.1 billion, but between $300 million and $700 million in leveraged funds were kept off the balance sheets. The accountant with the county auditor's office testified that in December 1993, he specifically asked members of the investment department if there were any outstanding reverse repurchase agreements left off the books and was told all investments were properly accounted for in the balance sheet.

In April 1994, Crain's Cleveland Business, a respected local financial newspaper, published an article questioning the safety of SAFE's core fund in light of the bond market decline. The fund's portfolio showed losses of $90 million at the time.

After the Crain's article went to press, the investment department prepared a "doomsday strategy" to plan for the possibility that the county's coinvestors would "run" on all the assets in the fund. They examined prior audits by independent auditing firms and their own incomplete financial data and determined that SAFE could withstand a total withdrawal of assets.

This assessment was grossly incorrect. The reports from the outside auditing firms were incomplete because they were unaware of the off-balance repurchase investments. Moreover, the investment office's practice of utilizing a cost approach to value its investments rather than their current market value overstated the fund's financial position and lulled the investment department into a false sense of security.

Continued depression in the bond market caused further losses. Members of the investment department began questioning the fund's financial position, particularly its off-balance investments. In response to their inquiries as to whether Gaul was aware of the fund's mounting losses, Simmerly replied that he "took care of it." At the same time, Simmerly began extending the maturities on SAFE's collateral repurchase agreements and borrowed from interest being earned on other losing securities to cover these extensions.

In 1994, members of the public obtained copies of the fund's portfolio under the sunshine laws. After reviewing them, these citizens tipped reporters at the Cleveland Plain Dealer that SAFE was in a precarious financial position. In September, the reporters contacted SAFE officials to set up a meeting to discuss the fund's current status. Both Simmerly and Gaul attended the meeting, at which Simmerly responded to questions focused on the off-balance investment activities. Several witnesses testified that Gaul seemed surprised to hear about the leveraged transactions and the fact that these were kept off the fund's balance sheet.

The Plain Dealer ran its reports on the SAFE program in October 1994. At the time, Gaul was campaigning for the United States House of Representatives.

The reports generated a great deal of media attention, leading fund investors to question the safety of their investments. In a meeting with the county commissioners, Gaul informed them of the fund's problems. He relinquished control of the fund to the commissioners, who decided to liquidate the fund in order to prevent its investors from making a "run" on its assets by withdrawing their investments. True to its guarantee, Cuyahoga County repaid all moneys that the other governments and subdivisions deposited. All told, the termination of the SAFE program cost the county $115 million.

## II. Procedural History

On June 22, 1995, Gaul was indicted on one count of dereliction of duty, R.C. 2921.44(E), a second degree misdemeanor. The indictment articulated the alleged offense in terms of the language used in the statute, as is permitted by R.C. 2941.05, stating that Gaul "recklessly as a public servant failed to perform a duty expressly imposed by law with respect to his office."

Because the indictment failed to specify what "duty expressly imposed by law" Gaul violated, he filed a motion for a bill of particulars. On August 18, 1995, the state responded with a bill of particulars indicating that Gaul failed to perform his "fiduciary responsibilities to preserve and safeguard the financial integrity and soundness in the investments of Cuyahoga County's monies pursuant to Ohio Revised Code 135.35 and common law." It said that Gaul failed to ensure that his deputies "were acting in a manner to preserve the principal of the S.A.F.E. fund" and failed to ensure that the deputies "were administrating their investment responsibilities in a manner consistent with policy and procedures of the S.A.F.E. fund." The bill alleged that Gaul's chronic inattentiveness to the actions of his deputies constituted a "continuing course of conduct" and a "nonfeasance of his investment authority directly conferred upon [him] by statute."

On September 11, 1995, Gaul filed a motion to dismiss the indictment as supplemented by the first bill of particulars and, in the alternative, a motion for a second bill of particulars. The trial court never ruled on these motions. On or about November 1, 1995, the state filed a second bill of particulars of its own accord. This time, the state offered two more theories of liability. It alleged that Gaul "failed to monitor and control" the activities of his deputy treasurers in violation of his duty to that effect as stated in R.C. 321.04. In addition, the state alleged that Gaul failed to safeguard the financial integrity of the SAFE investments "by not maintaining and safekeeping all appropriate documents or records which would evidence investments acquired under the * * * Uniform Depositary Act" in violation of the duty imposed upon him by R.C. 135.35(D).

On November 17, 1995, Gaul filed another motion to dismiss the indictment as supplemented by the second bill of particulars. First, he argued that the

indictment as elaborated by the bills failed to state a criminal offense. Second, he argued that the charge was unconstitutionally vague. The trial court did not rule upon this motion either, so we presume it was denied *sub silentio.*[7]

Trial commenced on December 5, 1995. At the close of the state's evidence, Gaul moved for a judgment of acquittal pursuant to Crim.R. 29. The court denied the motion.

In his defense, Gaul claimed that he had no knowledge of the leveraged trading, maintaining that Simmerly knowingly kept these facts from him. To support this theory, the defense relied on various audits performed by independent firms that showed the fund to be healthy, specifically noting that these auditors were also unaware of the off-balance sheet investments.

The jury found Gaul guilty, and the court sentenced him to the maximum penalty allowed by law, ninety days in jail and a $750 fine. Gaul has appealed from this conviction, asserting ten assignments of error. They are:

"I. The trial court erred in failing to dismiss the indictment, as supplemented by the bill of particulars for its failure to state an offense.

"II. The trial court erred in admitting the testimony of Dennis Roche concerning the decision by the Regional Transit Authority not to invest in the SAFE fund.

"III. The trial court committed reversible error in admitting the hearsay testimony of Timothy Simmerly.

"IV. The court erred in failing to grant the defendant's motions for judgment of acquittal.

"V. The court erred in its charge to the jury.

"VI. The court erred in refusing to grant defendant a new trial based on juror misconduct.

"VII. The trial court erred in failing to admonish the jury not to discuss the case prior to deliberations, as is required by Ohio Rev.Code 2945.34.

"VIII. The trial court erred in failing to dismiss the indictment for violating the defendant's right to a speedy trial.

"IX. The trial court erred in failing to dismiss the indictment under the Notice Clause of the Sixth and Fourteenth Amendments to the United States

---

7. *Newman v. Al Castrucci Ford Sales, Inc.* (1988), 54 Ohio App.3d 166, 169, 561 N.E.2d 1001, 1004.

Constitution and the Indictment Clause and the Notice Clause of Article I, Section 10 of the Ohio Constitution.

"X. The trial court erred in sentencing the defendant."

### III. Discussion

The fourth assignment of error is dispositive. In it, Gaul argues that the trial court should have granted his motion for judgment of acquittal because the state did not prove that he violated a duty expressly imposed by law and/or that he failed to keep records of SAFE investments. He also argues that the state failed to prove that he acted with the required mental state under R.C. 2921.44(E), *i.e.*, recklessness.

A motion for acquittal should not be granted where the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt. *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus. "The purpose of a motion for judgment of acquittal is to test the sufficiency of the evidence, and, where the evidence is insufficient, to take the case from the jury." *Dayton v. Rogers* (1979), 60 Ohio St.2d 162, 163, 14 O.O.3d 403, 404, 398 N.E.2d 781, 782. It should be granted where the evidence is so slight or of so little probative value that reasonable minds *must* have reasonable doubts as to the defendant's guilt. See *Bridgeman,* 55 Ohio St.2d at 264, 9 O.O.3d at 402–403, 381 N.E.2d at 185–186. The grounds for acquittal are strongest where the state entirely fails to produce any evidence to support an essential element of the charge. *State v. Kline* (1983), 11 Ohio App.3d 208, 213, 11 OBR 330, 336–337, 464 N.E.2d 159, 164–165. See *State v. Manago* (1974), 38 Ohio St.2d 223, 67 O.O.2d 291, 313 N.E.2d 10.

R.C. 2921.44(E) provides:

"No public servant shall recklessly fail to perform a duty expressly imposed by law with respect to his office, or recklessly do any act expressly forbidden by law with respect to his office."

One of the essential elements of the charge is that the accused was under a duty *expressly* imposed by law. If such a duty can be identified, there must have been evidence showing that Gaul actually violated it for his motion for judgment of acquittal to have been properly denied.

The grand jury issued what can only be described as a vague allegation charging Gaul with violating an undefined duty imposed by an unspecified law. The state filed two bills of particulars setting forth three distinct theories that Gaul violated duties imposed by R.C. 135.35(A) and (D), as well as R.C. 321.04. We discuss them in turn.

## A. Duty to Safeguard Financial Integrity of Fund

The first bill of particulars alleged that Gaul failed to perform his "fiduciary responsibilities to preserve and safeguard the financial integrity and soundness in the investments of Cuyahoga County's monies pursuant to Ohio Revised Code 135.35 and common law." Pursuant to R.C. 135.35(A), the "investing authority" of a county is specifically authorized to invest all or any part of a county's inactive funds in any one of a variety of listed investments. R.C. 135.35(A)(1) through (5), (B). R.C. 135.31(C) defines "investing authority" as the county treasurer.[8]

When a statute authorizes performance of a particular act, but does not specify how that act is to be done, the general inference is that the act is to be carried out in a reasonable manner. *State ex rel. Atty. Gen. v. Morris* (1900), 63 Ohio St. 496, 512, 59 N.E. 226, 230; *Jewett v. Valley Ry. Co.* (1878), 34 Ohio St. 601, 608. In the context of a statute commanding a public official to invest public money, there is an *implied* duty to perform the investments in a reasonable manner. As stated by the Attorney General:

"[A]ny decision with respect to the investment of moneys of a governmental entity must be made in accordance with the fiduciary standards generally applicable to the investment of public moneys by such entity. See, *e.g.*, *State v. Herbert*, 49 Ohio St.2d 88 [3 O.O.3d 51], 358 N.E.2d 1090 (1976); *Crane Township, ex rel. Stalter v. Secoy*, 103 Ohio St. 258, 132 N.E. 851 (1921). In general, a public officer, as a fiduciary with respect to public funds under such officer's control, is required to exercise the same degree of care, skill, and judgment with respect to investment decisions as are consistent with the fiduciary responsibility to preserve and safeguard the financial integrity and soundness of such funds. See generally 1989 Op. Att'y Gen. No. 89–033 at 2–151 to 2–156. As noted in Black's Law Dictionary (6th ed. 1990) at 625, '[t]he status of being a fiduciary gives rise to certain legal incidents and obligations, including the prohibition against investing the money or property in investments which are speculative or otherwise imprudent.'" 1994 Ohio Atty.Gen.Ops. No. 94–048, at 2–241, quoting 1993 Ohio Atty.Gen.Ops. No. 93–054.

The Attorney General stated that, in his opinion, investments made under R.C. 135.35(A) must be made in accordance with those fiduciary standards of care, skill and judgment as are generally applicable to the handling of public moneys.

---

8. This section contains an express exception to the designation of the treasurer as the investing authority. If the treasurer fails to heed the advice or directives of the county board of commissioners, the board may designate itself or some other person as the investing authority. R.C. 135.34. No such resolution was issued in this case. Gaul was the investing authority at all pertinent times.

It is arguable that Gaul violated his fiduciary responsibility to preserve and safeguard the financial integrity and soundness of the SAFE fund.[9] He should have monitored more closely the investment activities of his deputies.

*But a violation of this duty is not a crime.* When a public official grossly mismanaged public moneys, the common law held him to be civilly liable for the losses. Again, as explained by the Attorney General in the opinion just quoted:

"It is a well-settled rule in Ohio that a public official is liable for the loss of public moneys, even though illegal or otherwise blameworthy acts on his part were not the proximate cause of the loss of public moneys. *State v. Herbert,* 49 Ohio St.2d 88, 96–97 [3 O.O.3d 51, 55–56], 358 N.E.2d 1090, 1095 (1976); *Seward v. National Sur. Co.,* 120 Ohio St. 47, 49–50, 165 N.E. 537, 538 (1929); *Crane Township ex rel. Stalter v. Secoy,* 103 Ohio St. 258, 132 N.E. 851 (1921); 1980 Op. Att'y Gen. No. 80–074. In addition, 'where any public officer orders or participates in the ordering of the expenditure of public funds, which expenditure is not authorized by law, such officer is personally liable for the amount of the funds so expended.' 1952 Op. Att'y Gen. No. 1713, p. 559 at 566; See *Crane Township ex rel. Stalter v. Secoy;* see also *State v. Herbert* (syllabus) ('R.C. 135.14 which allows the Treasurer of State to invest interim moneys in the commercial paper of certain private corporations, does not alter the common-law standard of liability for loss of public funds by public officials where the investment is in violation of the maximum investment limitation embodied in the statute'). 'The nature of this liability has been described as that of an insurer of the safety of the public funds.' 1993 Op. Att'y Gen. No. 93–004 at 2–25; accord *State ex rel. Bolsinger v. Swing,* 54 Ohio App. 251 [7 O.O. 438], 6 N.E.2d 999 (Hamilton County 1936).

"The common law rule of liability for public officials handling public moneys has been codified in R.C. 9.39, which provides, in pertinent part, '[a]ll public officials are liable for all public money received or collected by them or by their subordinates under color of office.' As stated in Op. No. 93–004 at 2–26, '[t]he language of R.C. 9.39 with respect to the liability of public officials is plain and unambiguous. Public officials are held liable, pursuant to R.C. 9.39, only for public money that they or their subordinates receive or collect.' Thus, a public official will be held personally liable if public moneys that come into his possession or custody in his official capacity are lost." *Id.,* 1994 Ohio Atty.Gen. Ops. No. 94–048 at 2–244.

---

9. R.C. 135.39 insulates the county treasurer from liability for the loss of any public funds deposited with or invested by his office if he acted in accordance with law or pursuant to an ordinance or resolution adopted by the county. We cannot determine from the record whether all of Gaul's actions complied with the requirements of the Revised Code and Cuyahoga County resolutions, and this opinion should not be interpreted as deciding the matter for *res judicata* purposes should civil litigation follow this appeal.

852

These fiduciary duties to preserve public moneys cannot serve as the basis of a criminal charge for dereliction of duty under R.C. 2921.44(E) because they are merely implied in the general grant of authority to make the investments in R.C. 135.35(A). R.C. 2921.44(E) requires the underlying statute to *expressly* impose a duty upon the accused; an *implied* duty is therefore insufficient to support a charge of dereliction of duty.[10]

### B. Duty to Monitor and Control Deputies

■ In the second bill of particulars, the state offered another theory of liability that is quite similar to the first. The state alleged that Gaul violated a duty to monitor and control his deputies that is supposedly imposed by R.C. 321.04. That section provides:

"Each county treasurer may appoint one or more deputies, and he shall be liable and accountable for their proceedings and misconduct in office."

We reject the state's assertion that this section may support a charge of criminal dereliction of duty for the same reasons we rejected its first assertion. R.C. 321.04 says that the treasurer is "liable and accountable" for the misdeeds of his subordinates. The word "liable" means that the treasurer is responsible in a civil sense if the deputies under him mismanage public funds. Black's Law Dictionary (6 Ed.1990) 19, defines the word "accountable" to mean "subject to pay, responsible, liable." Taken together, these words support the proposition that the state can recover judgment against the treasurer for the misconduct of the deputies. This section appears to have codified the common law of *respondeat superior* and thus contemplates a civil action; it was not designed to support a criminal prosecution.

Like the preceding statute, R.C. 321.04 does not expressly require the treasurer to do anything. There is no duty explicitly imposed such that the treasurer

---

**10.** The trial court recognized the imperative of an express duty to be alleged and proven:

"THE COURT: Well, of course, this issue of duty, what is the duty of the treasurer is spelled out in your bills of particulars, isn't that right, counselor?

"MR. RILEY [The prosecutor]: As has been said from the very beginning, the duties that are spelled out are only those that relate to the uniform depositary act and the concomitant duties that relate specifically to the state or at least county treasurer having responsibility for those underlings. But as far as any kind of categorized or catalogued listing of the responsibility of the state treasurer, it was stated by opposing counsel, in fact, the code is silent on that particular issue.

"THE COURT: The code is silent?

"MR. RILEY: On the particular issue of being catalogued in the fashion. There is, in fact, a duty imposed on the treasurer by the uniform depositary act, and I believe by the segment, section that describes the treasurer's responsibilities.

"THE COURT: All right. I'm going to let the case go forward. I'm overruling the motion, and I want the state to define particularly the duty expressly imposed by law * * *."

The state has failed to respond to this request of the trial court, and was unable to articulate the express duty in argument before this court.

may be prosecuted under R.C. 2921.44(E) for failing to do what he was instructed to do. Without such an explicit directive in the text of R.C. 321.04, that statute cannot serve as the basis for a charge of criminal dereliction of an express duty imposed by law.

Gaul was right in that the state failed to prove that he violated a duty expressly imposed by either R.C. 135.35(A) or 321.04. Violations of those sections cannot give rise to criminal liability.[11]

### C. Duty to Safekeep Documents

■ The second bill of particulars charges that Gaul violated his duty regarding the SAFE investments "by not maintaining and safekeeping all appropriate documents or records which would evidence investments acquired under the * * * Uniform Depositary Act" in violation of R.C. 135.35(D). Arguably, this language can be read as charging Gaul with (1) failure to maintain records and (2) failure to safekeep documents evidencing investments.

A close reading of R.C. 135.35(D) reveals that there is no duty to "maintain records" expressly stated in its text. That section provides:

"The investing authority shall be responsible for the safekeeping of all documents evidencing a deposit or investment acquired under this section including, but not limited to, safekeeping receipts evidencing securities deposited with a qualified trustee, as provided in section 135.37 of the Revised Code, and documents confirming the purchase of securities under any repurchase agreement under this section shall be deposited with a qualified trustee, provided, however, that the qualified trustee shall be required to report to the investing authority, auditor of state, or an authorized outside auditor at any time upon request as to the identity, market value, and location of the document evidencing each security * * *."

This section does impose a duty upon the treasurer to "safekeep[ ] * * * all documents evidencing a[n] * * * investment." He is also required to "safekee[p] receipts evidencing securities deposited with a qualified trustee" and "documents confirming the purchase of securities under any repurchase agreement." The word "records" simply does not appear. As R.C. 135.35(D) does not expressly impose a duty to "maintain records," this statute cannot support the notion that Gaul should be criminally liable for inadequate record-keeping.

■ We also note that there was evidence introduced during the trial suggesting that Gaul failed to report the repurchase agreements. They were not listed

---

11. Our research has failed to uncover a single case where a violation of R.C. 9.39, 135.35(A), or 321.04 has given rise to a criminal prosecution for dereliction of duty under R.C. 2921.44(E).

on the balance sheets shown to federal regulators, potential investors, independent auditors, and the county advisory committee. Likewise, they were not included in the reports to the county auditor, although they seem to have been disclosed in the yearly reports to the state auditor. However, neither the indictment nor the bills of particulars mention a failure to report. Gaul cannot be convicted of a crime for which he was not charged.

Even if the prosecutor had thrown the word "report" into the second bill of particulars, like the word "records" had been, R.C. 135.35(D) does not impose a duty upon the treasurer to make reports in connection with repurchase agreements. When the treasurer decides to enter into such an agreement, the statute provides that the documents confirming the transaction must be deposited with the "qualified trustee." But the treasurer and other county and state agencies still may need information about those securities held by third parties under repurchase agreements. In the case where one of the designated agencies makes a request, the "qualified trustee" must report the location, identity, and market value of any such security. The treasurer has no comparable obligation to compile a report under this statute, so Gaul could not have been convicted of failing to report the repurchase transactions even if that charge had been properly made.

The only duty expressly imposed by R.C. 135.35(D) that is applicable in the circumstances of this case is the duty to "safekeep[ ] * * * all documents evidencing a[n] * * * investment," including "documents confirming the purchase of securities under any repurchase agreement." Because there is a duty to "safekeep documents" expressly stated in the terms of R.C. 135.35(D), this is a proper basis for a charge that the treasurer was derelict in his duty.

For three reasons, however, we narrowly construe this statute as requiring the treasurer to merely preserve the physical integrity of the documents themselves—to ensure that they are not damaged, lost or destroyed—not as imposing a duty to keep adequate financial records in accordance with accepted accounting principles.

First, the duty is phrased in very precise language. To repeat, the treasurer is not charged with a general duty to "keep records," which arguably could be interpreted to mean that the treasurer's office is to keep an accurate book of all repurchase investments. Instead, the treasurer is required to "safekeep documents evidencing investments." A plain reading of these words compels us to hold that they simply mean what they say—that the treasurer is to keep those documents safe.

Second, even if the language were susceptible of an alternative and more expansive meaning, we could not interpret this phrase any differently. All criminal statutes are to be strictly construed against the state. *State v. Hooper*

(1979), 57 Ohio St.2d 87, 89, 11 O.O.3d 250, 251–252, 386 N.E.2d 1348, 1349–1350; R.C. 2901.04(A). Inasmuch as we are considering R.C. 135.35(D) as the basis of a criminal charge, it too must be construed strictly against the state.

■ Third, there is another statute, R.C. 321.07, which requires the treasurer to keep an accurate accounting of all funds coming into his hands.[12] It would be redundant to give R.C. 135.35(D) a construction accomplishing the same effect.

■ At the close of the state's case, Gaul argued that it failed to prove that he violated the duty to safekeep the documents evidencing SAFE investments. After reviewing the evidence in light of our narrow construction of the treasurer's statutory duty under R.C. 135.35(D), we agree.

At trial, Dennis Roche, former director of budget and management for Cuyahoga County, testified that he had been hired as a consultant by the county commissioners after the problems with SAFE were exposed. He concluded that the treasurer's office failed to perform sufficient risk analysis of the county's investments. He further testified that from an accounting perspective, the statements submitted to the auditor significantly misrepresented the county's financial position. These shortcomings notwithstanding, Roche explained that during his analysis of SAFE he discovered a large quantity of confirmation documentation. Roche stated that "confirmations are essentially slips of paper that document a purchase or a sale of a security, and there were volumes of confirmation slips."

David Zentkovich, a manager with the accounting firm of Coopers & Lybrand LLP, testified that an audit conducted by his firm revealed inadequate accounting procedures in the SAFE fund resulting in insufficient management information to make good investment decisions. However, he further stated that he and his fellow auditors were able to recreate the cash activity but had to "find all the bank accounts that were administered by the treasurer's office, then, in turn, all the transactions that flowed through those, we needed to classify as either purchase and sales, investment income and the like. * * * And with the information that was being asked for and completed by the treasurer's office personnel, we were able to complete [that] schedule and actually pull it together in the form of a double-sided accounting system."

Jeffrey Fountain, Director of Fixed Income Research for Bank One Investment Advisors, testified that in October 1994, he investigated the asset management portfolio of SAFE and concluded that, from an investment management standpoint, the SAFE fund lacked clear asset or liability statements. Therefore, he

---

12. "The county treasurer shall *keep an accurate account* of all moneys received by him, showing the amount, the time, from what source received, and of all disbursements made by him, showing the amount, the time, and for what purpose paid." (Emphasis added.)

obtained statements of transactions from National City Bank, at which SAFE held an account, to confirm what the county held. He further explained:

"We went to National City because they were an outside third party where we could gain confirmation on the information that we received from the people in the treasurer's office. * * * I would say that the people in the treasurer's office were fully cooperative and we, at the end of the exploratory process with them, we had a complete picture, but not a confirmed picture."

Chris Krause, a former deputy treasurer in the investment department, testified that he kept an inventory list of all securities held by the county. When one was bought, he would record it on the list and remove the record when the security was sold. Similarly, Marcia Zalokar, another employee of the treasurer's office, testified that she kept records of all repurchase transactions, including a daily inventory kept on leveraged portion of the portfolio, but maintained two separate reports for the core portfolio and the leveraged portfolio.

Charles Emrick, a former investment broker, also testified that the treasurer's office possessed the relevant records and that these were obtainable by the public. Emrick said that he obtained a copy of the SAFE portfolio in July or August 1994 through his brother-in-law, Lee Weingart. When asked how Weingart obtained the portfolio, Emrick responded: "He went and asked the people at SAFE, I believe Tim Simmerly, for the portfolio. And under the sunshine laws in Ohio, they ha[d] to give [it] to him."

All of the evidence presented in the state's case demonstrated that, although the treasurer's office engaged in improper accounting and reporting procedures, the confirmatory documentation was, in fact, preserved. Investigators were able use these documents to reconstruct an accurate picture of the fund's demise. There was no evidence suggesting that Gaul failed to preserve the physical integrity of the documents evidencing SAFE investments. His motion for judgment of acquittal was well taken, and the trial court erred in denying it.

Gaul's fourth assignment of error is sustained.

We will not discuss the other assignments of error because they are moot. App.R. 12(A)(1)(c); 1992 Staff Note to App.R. 12(A).

### IV. Disposition

The judgment of the trial court denying the motion for judgment of acquittal is reversed. We vacate Gaul's conviction and sentence and enter judgment acquitting him of the crime charged. App.R. 12(B).

*Judgment reversed.*

NADER, J., concurs.

Holmes, J., concurs in judgment only.

Robert A. Nader, J., of the Eleventh Appellate District, sitting by assignment.

Robert E. Holmes, J., retired, of the Ohio Supreme Court, sitting by assignment.