JOURNAL ENTRY AND OPINION
Defendant Leann Hayley appeals from a June 4, 1998 judgment of conviction by a jury and sentence entered by Judge Carolyn B. Friedland on the basis that the judge; improperly denied her Crim.R. 29 motion for acquittal, violated her right to compulsory process by permitting Hayley's co-defendant to assert his right against self-incrimination through his counsel and off the record, and violated the provisions of R.C. 2929.19 by failing to notify her of the possibility of an increase in her prison term and the mandatory period of post-release control. We agree only with her. assignment of error challenging her sentence, and remand for further proceedings consistent with this opinion.
On April 9, 1998, the Cuyahoga County Grand Jury returned a two count indictment against Hayley: Count I alleged a violation of R.C. 2925.11 (drug abuse, possession of more than twenty kilograms of Marijuana); Count II alleged violation of R.C.2923.24 (possession of criminal tools — money, a pager and suitcases containing marijuana).
At trial, Detective Gene R. Cook, a member of the DEA Narcotic Intervention Team of the East Cleveland Police Department, testified that he and "Canine Gunner," a dog trained specially for narcotic detection, met Cuyahoga County Deputy Sheriff James A. Gilchrest, an agent of the Airport Interdiction Unit of the DEA Task Force, at Cleveland Hopkins International Airport on February 15, 1998. Gilchrest had received information from the San Diego DEA Airport Group that two suspected drug couriers were on Northwest Airlines Flight 1298 due to arrive at 9:11 p.m. They were identified as "Leann Hayley" and "Steve Matheson" and their physical descriptions, clothing and baggage claim tag numbers were provided. Gilchrest later testified that the descriptions were "way off."
After the plane left San Diego, Gilchrest verified that the two had boarded the flight and were en route to Cleveland. Detective Deborah Harrison, a member of the Narcotics Unit of the Cleveland Police Department and DEA Task Force, testified that the tickets were purchased from a San Diego travel agency recognized as one that catered to known drug dealers. Gilchrest testified that San Diego was a " source city," stating that the general bulk of drug trafficking coming into Cleveland, a "distribution" or "user city," came from the San Diego area.
When the flight arrived, Harrison watched the passengers deplane, and Cook and Gunner circled the three carts containing the luggage from that flight. Gunner climbed through the luggage on one cart and alerted Cook to four suitcases. Two of the suitcases were attributed to Hayley by the numbers on the baggage claim tags; the other two had Matheson's claim tags. Gilchrest said that a ticketing agent identifies luggage to a passenger first by asking various federally required questions, such as whether the passenger packed his own bag and then whether anyone had asked him to transport luggage not his own. Once the ticketing agent verifies that the passenger packed the luggage and that the luggage belongs to him, the ticket agent would then assign the bag a claim number. If the passenger had indicated that he did not pack the luggage or that the luggage belonged to someone else, that passenger would not be allowed to board.
After Harrison watched the last passenger deplane, she then proceeded to the luggage carousel. Gilchrest and his partner stood outside the area, conducting surveillance on the crowd. He noticed two people, later identified as Hayley and Matheson, who "operated outside the normal": they were not walking or talking together; they stood at opposite ends of the baggage carousel. While he admitted that it was not outside the norm for persons traveling together to take different positions around the luggage carousel, he noted that it was more common for drug couriers to do so. Harrison noted that Hayley stood with her back to the wall, speaking to no one, while she waited for her luggage. Gilchrest watched Hayley rent a "smart cart" and load the cart with two of the suitcases identified by Gunner and Matheson pick out the other two suitcases. Hayley and Matheson walked out of the baggage claim area separately and did not meet up with each other.
About 15 to 20 feet outside the baggage claim area, Harrison approached Hayley, identified herself, displayed her credentials and asked Hayley for identification. Hayley produced her California drivers' license and, according to Harrison, acted "quite nervous" in that Hayley's hands trembled and she was breathing heavily. While this type of response may not be out of the ordinary, Harrison thought Hayley responded in an "overly nervous" fashion. The drivers' license verified Hayley's identification and, based upon the tip identifying her as a possible drug courier, Harrison asked to see her plane ticket. The one-way ticket and the two baggage claim tags corresponded to the numbers identified by the San Diego tip.
When Harrison asked whether Hayley owned the bags, she responded in the affirmative but said she "left the hotel and someone else packed [her] clothes." When Harrison asked Hayley a second time whether she owned the bags, Hayley responded "yes." When asked whether she would permit the officers to search her bags, Hayley said "sure." The officers discovered that both bags were locked, and Hayley indicated that she did not have a key. The officers opened the suitcases by inserting a key into the zipper. The suitcases did not contain any of Hayley's clothing, or personal items, only blankets, pillows, and gift-wrapped packages.
After opening the gift-wrapped packages, Gilchrest found plastic-sealed blocks of marijuana wrapped with scented clothes dryer sheets. According to Gilchrest, this type of "packaging" technique is used to prevent detection by drug-sniffing dogs and was consistent with the movement of narcotics through the airport. A forensic scientist testified that one suitcase contained 9,692.70 grams of marijuana and the other contained 13,103.25 grams, approximately 50 pounds, which Harrison valued at $50,000.
Hayley was placed under arrest and taken to the airport DEA office where she was advised of her Miranda rights. Gilchrest gave Hayley a written copy of the Miranda rights, which she signed, and then he took her written statement. Matheson had also been arrested and was placed in the same room with Hayley.
Gilchrest explained that drug couriers do not exhibit a similar physical appearance or profile; rather, he identified them through a particular pattern of behavior that would "stand out of the norm," e.g., purchasing a one-way ticket at the last minute, disposing of tickets and baggage claim stubs immediately upon arrival, or standing in a group and not conversing. In the case of Hayley and Matheson, he noticed that they did not stand near or look at each other and, when law enforcement initiated the stop, they both became very nervous and agitated. He admitted that, although Hayley held a one-way ticket, she had not disposed of either her ticket or the claim stubs upon her arrival.
Gilchrest also noted that, once a drug courier exits the airplane, rather than visit the restrooms or greet loved ones, he goes directly to the baggage claim area. If the courier is the last passenger off the plane, he will be the first of the passengers to arrive at the baggage carousel. According to Gilchrest, drug couriers often engage in counter-surveillance measures, including looking to see who may be behind them. In addition, Gilchrest noted, while most people recognize their luggage, drug couriers check the bag tags since most have seen their luggage only 20 minutes before departure. Harrison also added that drug couriers rarely carry a key to the luggage. In addition, 98 percent of the people approached by DEA will consent to a search of their luggage even though it contains narcotics. Gilchrest explained that drug couriers would most often come from "source cities" like New York, Miami, Fort Lauderdale, Houston, El Paso and any city in California or Mexico.
Upon cross-examination by defense counsel, Harrison testified that a search warrant was not obtained and the police did not investigate any information on Hayley's pager but, she added, such information would not be of use in drug interdiction cases.
At the close of the state's proofs, Hayley's lawyer moved for a Crim.R. 29 dismissal which the court overruled.
During her case in chief, Hayley testified that she worked for a real estate company and took courses at a junior college. She had applied for a position at the San Diego Sheriff's Department as a correctional officer, had successfully passed the background investigation and interview process, and awaited the medical and psychological examinations.
Hayley explained that she had no idea she would be traveling to Cleveland until St. Valentine's Day. Matheson, her boyfriend of six months, had surprised her by stating they would spend the night at a Marriott Hotel. She packed an overnight bag, and Jamaica, Matheson's female co-worker at a recording studio, drove them from Hayley's apartment to the hotel. Hayley claimed Matheson had explained that Jamaica drove them because he did not want to leave his prized 1987 IROC Camaro in the hotel parking lot. On route, Matheson presented Hayley with airline tickets to Cleveland, telling her that he had to transport some equipment for his job at a studio in that city. Later in her testimony Hayley stated she was given the ticket in the hotel the next morning. She understood that they would stay overnight in Cleveland and return to San Diego the next day and was excited because her last trip out of California was twenty-two years ago, when she turned 18. Hayley assumed she was given a round-trip ticket and did not inspect the ticket to verify the flight.
The next morning, Donovan, another Matheson associate, and Jamaica brought four suitcases to the hotel room that, Hayley believed, contained equipment. Hayley and Matheson then left for the airport and when the couple checked the luggage with the airline, she claimed two of them under her name even though the four suitcases belonged to Matheson. Hayley stated she could not remember the ticketing agent asking questions about the luggage and testified she claimed ownership of the two suitcases at Matheson's request to save him the expense of paying for the additional luggage. She admitted she thought it strange that they were not seated together, but she accepted Matheson's excuse that he could not arrange it.
In Cleveland, Matheson allegedly told Hayley to go to the opposite end of the carousel to pick up her luggage and whoever first retrieved his luggage was to exit the building and hail a cab. Matheson did not explain why, and Hayley did not ask because she said she just did what she was told. After she located her luggage and noticed that Matheson was still looking for his, she headed for an exit.
As she reached the door, Detective Harrison approached, identified herself as a DEA agent, and began asking questions. Hayley said two other officers accompanied Harrison, and she became extremely nervous. After her luggage was opened, someone commented that this is what they were looking for, although Hayley claimed she did not know what they meant, she accompanied them to the DEA office. She claimed that she first discovered the suitcases contained marijuana when Harrison told her what was inside. The officers requested the couple complete the delivery, and to act as if they had not been apprehended. Matheson called Donovan who, Hayley claimed she discovered for the first time, was Matheson's San Diego drug contact. At the officer's direction, she acted like she was scared and wanted to go home.
At the time of her arrest, Hayley claimed to have had "about $100" in cash and a pager in her possession. She said that she carried cash to buy souvenirs for her four children and in the event "something happened." She said she had the pager because, as part of her real estate job, she spent eight hours a day on the phone, and she did not want the children to interrupt. The range of the pager was limited to the 619 area code. Hayley testified that the officers had, in fact, checked the telephone numbers on her pager only to discover that the only number was that of her home phone.
On cross-examination, Hayley admitted that her testimony varied significantly from a written statement she had given at the time of her arrest. In the written statement, Hayley stated Donovan asked her whether she wanted to make some extra money to support her children. She agreed "as long as no drugs or illegal [sic]." Donovan told her that it was not illegal and all she had to do was fly to Cleveland and deliver the bags to a hotel at 4511 Northfield Road, return to the airport and fly home. Jamaica assured her that "there's nothing wrong with this — that it's safe. Jamaica claimed she had traveled to New York, and Donovan had made "several trips." Hayley claimed that she made the written statement because the detective "pushed and pushed and pushed." When she told this detective that she did not know anything, he told her to put down what she knew. "So I wrote down what Steve was saying." She claimed that she heard the Northfield address and all other details while listening to Matheson give his statement to the DEA agents.
Hayley's lawyer intended to call Matheson to testify, obtained the subpoena on May 14, 1998, the first day of trial, and the subpoena was served on May 15, 1998. Although neither Matheson, who was incarcerated and awaiting his own trial, or his defense attorney, who advised Hayley's lawyer Matheson would not testify, were present, the judge concluded that Matheson had an absolute constitutional right not to testify and precluded calling him to the stand.
After the judge gave the jury its instructions, Hayley's lawyer renewed the Crim.R. 29 motion which the judge overruled. The jury returned its verdict of guilty on both counts and Hayley was sentenced to an eight-year mandatory prison term on Court I and a concurrent twelve-month term on Count II.
Hayley's first assignment of error states:
 I. MS. HAYLEY'S RIGHTS UNDER ART. I, SECT. 16 OF THE OHIO CONSTITUTION, AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION, WERE VIOLATED, AND SHE WAS IMPROPERLY DENIED A CRIM.R. 29 ACQUITTAL, WHEN THERE WAS INSUFFICIENT EVIDENCE THAT SHE KNOWINGLY POSSESSED THE MARIJUANA OR THAT SHE POSSESSED THE MONEY, PAGER OR SUITCASE AS CRIMINAL TOOLS.
Hayley argues that she was "a dupe, not a criminal" and that the state failed to put forth sufficient evidence to show that she knew the suitcases contained marijuana. Without such proof beyond a reasonable doubt of such knowledge or intent, she could not have been convicted of either possession of the marijuana or of possession of a suitcase with the intent to use it for a criminal purpose. Moreover, she argues, the state put forth no evidence whatsoever to support a conviction for possession of criminal tools with regard to the money or the pager. As a result, she contends, the judge should have granted the Rule 29 motion for acquittal.
The state claims that it produced evidence satisfying all of the elements of both charges and, therefore, the judge did not err.
Crim.R. 29 (A) requires a judge to enter a judgment of acquittal, upon motion of the defendant at the conclusion of the evidence by either side, if the evidence is insufficient to sustain a conviction on a charged offense. A judge may not enter a judgment of acquittal "if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."State v. Bridgeman (1978), 55 Ohio St.2d 261, 381 N.E.2d 184
syllabus; accord State v. Semenchuk (1997), 122 Ohio App.3d 30,48, 701 N.E.2d 19, appeal not allowed (1997), 80 Ohio St.3d 1425,685 N.E.2d 238. "The purpose of a motion for judgment of acquittal is to test the sufficiency of the evidence and, where the evidence is insufficient, to take the case from the jury."Dayton v. Rogers (1979), 60 Ohio St.2d 162, 163, 398 N.E.2d 781, overruled on other grounds; State v. Lazzaro (1996), 76 Ohio St.3d 261,266, 667 N.E.2d 384. "The grounds for granting a judgment of acquittal are strongest when there is a failure to prove an element essential to the offense." State v. Kline
(1983), 11 Ohio App.3d 208, 213, 464 N.E.2d 159. When reviewing such a motion, the judge must consider whether, upon viewing the evidence adduced at trial in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492
paragraph two of the syllabus; Semenchuk, 122 Ohio App.3d at 48; cf. State v. Gaul (1997), 117 Ohio App.3d 839, 849,691 N.E.2d 760 ("It should be granted where the evidence is so slight or of so little probative value that reasonable minds must have reasonable doubts as to the defendant's guilt."), appeal not allowed (1997), 79 Ohio St.3d 1457, 681 N.E.2d 440. This appeals court applies the same standard of review as that applied by the judge. See Semenchuk, 122 Ohio App.3d at 48; see, also, Gaul,117 Ohio App.3d at 856.
Section 2925.11 (A) provides that a person shall not knowingly obtain, possess, or use a controlled substance. Subsection (C) (3) (f) further provides that a person found in possession of marijuana in an amount in excess of twenty thousand grams is guilty of a felony of the second degree. Pursuant to R.C. 2901.22
(B),
 [a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.
In brief, the state provided sufficient evidence to show that Hayley had "knowledge" as defined in R.C. 2901.22 (B). Both Gilchrest and Harrison testified that Hayley and Matheson did not speak to or acknowledge the other and proceeded to opposite ends of the luggage carousel, a pattern more common to drug couriers. Harrison also noted that Hayley stood at the carousel with her back to the wall, an action tending to show that she was engaged in counter-surveillance. In addition, when Harrison stopped Hayley and asked whether the suitcases were hers, Hayley indicated that the suitcases were, in fact, hers but volunteered that she did not pack them. Had Hayley admitted this to the ticketing agents in response to their federally mandated questions, she would not have been allowed to board the plane. As such, the jury could infer that she knew of the illegal nature of the contents of the suitcase and lied to avoid detection by the ticketing agent and/or culpability for the crime. In addition, Hayley did not have the keys to the suitcases, another indicia of a drug courier. The jury also could have reasonably inferred from her written statement that she knew of the contents of the suitcases.
Viewing the evidence of record in a light most favorable to the prosecution, the state put forth sufficient evidence such that any rational trier of fact could have found, beyond a reasonable doubt, that Hayley knowingly possessed an amount of marijuana in excess of 20 kilograms, as charged in Count I. Therefore, the judge properly denied Hayley's motion for judgment of acquittal on this count.
However, with regard to Count II, possession of criminal tools, the state provided nothing to show that Hayley possessed the pager or money with a purpose of criminal use. Section 2923.24
(A) prohibits a person from "possess[ing] or hav[ing] under his control any substance, device, instrument or article, with purpose to use it criminally." Subsection (B) (3) provides that the "[p]ossesion or control of any substance, device, instrument, or article commonly used for criminal purposes, under circumstances indicating such item is intended for criminal use" constitute prima facia evidence of criminal purpose.
The only testimony elicited regarding either article came from Hayley's lawyer's cross-examination of Harrison about the pager and Hayley's own testimony about both the pager and the money. With regard to the pager, Harrison testified that the police did not obtain a search warrant for the pager to determine its contents because its contents would not have been important to the investigation. At no time did the state's witnesses testify that a pager is commonly used for criminal purposes and that it was possessed, in this case, under circumstances indicating that Hayley intended to use it for a criminal purpose.
In addition, the state presented no testimony about Hayley's money. It was Hayley who testified that she had "about $100" in her possession which she intended to use for souvenirs and "just in case." The trial transcript does not reveal the exact amount of money in her possession.[1] Again, at no time did the witnesses for the prosecution testify that money is commonly used for criminal purposes and that it was possessed, in this case, under circumstances indicating that Hayley intended to use it for a criminal purpose.
However, the state need only prove the illegal possession of one criminal tool to sustain a single conviction under R.C.2923.24. State v. McShan (1991), 77 Ohio App.3d 781, 784. Upon review of the evidence in the light most favorable to the prosecution, this Court concludes that the state produced sufficient evidence in the present case such that any rational trier of fact could have found the essential elements of the crime of possession of criminal tools, i.e., the two suitscases, proven beyond a reasonable doubt.
The testimony showed the luggage was packed in a manner typical to those carried by drug couriers. The packages of marijuana had been covered with scented dryer sheets and wrapping paper, and placed into two suitcases containing blankets and pillows, all in an effort to mask the odor from detection. Given this evidence, the jury could have reasonably concluded that Hayley possessed the suitcases for the purpose of facilitating the transport of marijuana, an illegal substance. Therefore, the judge properly denied Hayley's motion for acquittal on Count 2, possession of criminal tools. The first assignment of error is overruled.
 II. THE TRIAL COURT DENIED MS. HAYLEY THE CONSTITUTIONAL RIGHTS OF COMPULSORY PROCESS[,] CONFRONTATION[,] AND DUE PROCESS[,] AND HER RIGHT TO A MEANINGFUL APPEAL, WHEN IT ASSUMED THAT A PROPERLY SUBPOENAED AND CRUCIAL WITNESS, THE CO-DEFENDANT, WHO WAS NOT ON TRIAL, HAS A BLANKET PRIVILEGE AGAINST INCRIMINATION TO REFUSE TO APPEAR; THAT THE PRIVILEGE MAY BE ASSERTED THROUGH COUNSEL AND OFF-THE-RECORD; AND THAT THE JURY SHOULD NOT KNOW THAT THE CO-DEFENDANT HAD ASSERTED THE PRIVILEGE.
Hayley argues a violation of her constitutional rights when the judge held that Matheson, who failed to honor a subpoena to appear as a witness, had asserted a Fifth Amendment privilege against self-incrimination. She also argues a violation of her rights by permitting Matheson's lawyer to assert the privilege on Matheson's behalf and off the record. Hayley claims that Matheson' s testimony was crucial to her defense since he was the only witness to the event other than the officers. Therefore, because she was denied a meaningful defense, this action should be reversed.
The state contends that Hayley's lawyer made no effort to contact Matheson's lawyer at any time prior to trial and did not issue the subpoena until the day of trial. It also contends, because there was no proffer of Matheson's purported testimony, the issue was waived. Had the judge mandated Matheson's appearance, the state suggests, he would do nothing more than invoke his Fifth Amendment privilege from which the jury could make impermissible inferences. Therefore, it asserts, the judge properly prevented Hayley's lawyer from calling Matheson as a witness.
The following exchange occurred at the close of the state's case between Mr. Owens, Hayley's counsel, the judge, and the prosecutor, Ms. Hilow,:
 MR. OWENS: Well, one other matter I have on behalf of the defendant Leann Hayley, I caused a subpoena to be issued for co-defendant Steve Matheson. I have been in touch with — I called his attorney's office, a Miles Camp, I think his name is, and I received information that Mr. Matheson is going to disobey the subpoena and say he's not going to honor it at all.
 He is just not going to honor the subpoena, and I would like the Court to be apprised of that, and because it's very important in the interest of justice, and among the thinks [sic] I am going to do is ask the court to declare him a hostile witness so I can cross-examine him.
 But I want the Court to know that he is going to disobey the subpoena and not show.
 THE JUDGE: First of all, we don't even know that the defendant received the subpoena. He has an absolute constitutional right to not testify, and he —
MR. OWENS: I don't know why not.
 THE JUDGE: And he has chosen to exercise his constitutional right. He could have some exposure in this case.
 MR. OWENS: I don't know what he's going to do. He may come up. I don't know what he's going to say. He's got some exposure, yeah.
 THE JUDGE: He doesn't want to say anything and you have no right to talk to him without his lawyer, and his lawyer indicated that he is not going to produce him.
MR. OWENS: As long as the record indicates.
THE JUDGE: And it does.
 MR. OWENS: They have decided that they're not going to testify for whatever the reason. I think I need his testimony in the interest of justice to properly defend Leann Hayley.
 He's the only other person who was there that was not a police officer on both ends. And he's the only person who has any knowledge other than the defendant.
 I think his testimony is very germane and very important and I think without his testimony that it would be damaging, irrevocably. I think it would be too late to go after the case — we don't know what he might say. He might get up there and say something from Perry Mason.
 THE JUDGE: The fact of the matter is that he does have a constitutional right to remain silent. He has chosen to exercise that right, and there's nothing any of us can do.
 MR. OWENS: I would like him to say that. I just got a note.
 THE JUDGE: He has done it through his lawyer. And if you would like, I would indicate to the ladies and gentlemen that he was subpoenaed and he exercised his constitutional right not to testify, and
MISS HILOW: I would object to that.
MR. OWENS: I wouldn't.
 MISS HILOW: He has no right to know that he subpoenaed or did not subpoena the co-defendant. Mr. Matheson is going to be tried then in abstentia[.] You don't list the witnesses.
 Mr. Owens waits until this morning to contact the attorney to try and get this defendant here to testify.
 MR. OWENS: Let me tell you how it happened. Miss Hilow informed me that she was going to call Steve Matheson as her witness. I told her, good. Let me have a copy of his police record. In the process of getting that for me, she, in turn, told me she changed her mind, being at that point in time I told her I would subpoena him. That's why I was so late.
 MISS HILOW: It was yesterday morning prior to the start of this trial that I informed you that we were not going to be using Mr. Matheson and he did not have a criminal record. You had that from yesterday morning.
 MR. OWENS: At the noon break I subpoenaed him. I couldn't leave the Court. It was at the noon break that I filed a subpoena.
 THE JUDGE: Mr. Ownes [sic], he's not on the State's witness list.
MR. OWENS: Well, he's —
THE JUDGE: Mr. Owens, he's not coming.
* * *
Both the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution provide an accused with a right to compulsory process to obtain favorable witnesses or evidence. Pennsylvania v. Ritchie (1988),480 U.S. 39, 56; Columbus v. Cooper (1990), 49 Ohio St.3d 42, 44,550 N.E.2d 937. A witness may not invoke the Fifth Amendment privilege against self-incrimination by simply asserting that the information sought may, in a general sense, incriminate him.Cincinnati v. Bawtenheimer (1992), 63 Ohio St.3d 260, 266,586 N.E.2d 1065. Rather, the judge, not the witness, must determine whether there is a sufficient hazard of incrimination. Id.; Statev. Landrum (1990), 53 Ohio St.3d 107, 120, 559 N.E.2d 710. A valid assertion of the privilege exists where the witness has reasonable cause to apprehend a real danger of incrimination.Landrum, supra. This not only applies to evidence that may directly support a criminal conviction, it also applies to evidence that may furnish a link in the chain of evidence that could lead to the witnesses's subsequent prosecution.Bawtenheimer, supra. However, the privilege may not be asserted in advance of the questions; it must be asserted upon particular questions. In re Morganroth (C.A. 6, 1983), 718 F.2d 161, 167.
While "`[t]his right is a fundamental element of due process of law,'" it is not without limits. State v. Denis (1997), 117 Ohio App.3d 442,446, 690 N.E.2d 955 quoting Washington v. Texas
(1967), 388 U.S. 14, 19; State v. Blankenship (1996), 102 Ohio App.3d 534,550, 657 N.E.2d 559 affirmed 74 Ohio St.3d 522,660 N.E.2d 448. An accused's right to present his own witnesses to establish a defense is prescribed by the rules of evidence.Denis, 117 Ohio App.3d at 446; see Blankenship,102 Ohio App.3d at 550. ("An accused does not have the right to compulsory process to obtain evidence that is inadmissible under standard rules of evidence.") The right is also limited by the proposed witness's Fifth Amendment right against self-incrimination. SeeState v. Kirk (1995), 72 Ohio St.3d 564, 651 N.E.2d 981. As a general rule,
 [a] trial court may exclude a person from appearing as a witness on behalf of a criminal defendant at trial if the court determines that the witness will not offer any testimony, but merely intends to assert the Fifth Amendment privilege against self-incrimination.
Id. at paragraph one of the syllabus. Because "[a] jury simply may not consider invocation of the privilege against self-incrimination for any purpose," Cooper,49 Ohio St.3d at 47, such testimony would not be relevant to any fact in issue and, therefore, a judge properly precludes such a witness from taking the stand when the witness merely intends to assert the Fifth Amendment privilege. See Evid.R. 402; State v. Branham
(1995), 104 Ohio App.3d 355, 360, 662 N.E.2d 54 ("There is no evidentiary value to a witness' asserting the Fifth Amendment privilege against self-incrimination."), appeal not allowed (1995), 74 Ohio St.3d 1444, 656 N.E.2d 344. However,
 [w]here a defendant is not entitled to call a witness to the stand because of the witness' intention to assert the Fifth Amendment privilege against self-incrimination, the defendant is entitled to request an instruction that the jury should draw no inference from the absence of the witness because the witness was not available to either side.
Kirk, 72 Ohio St.3d at paragraph two of the syllabus.
In the present case, Matheson's Fifth Amendment privilege appears to be based upon a representation by Matheson's lawyer to Hayley's lawyer that Matheson would not "honor" the subpoena. The judge incorrectly concluded that Matheson held an "absolute"Fifth Amendment privilege not to testify. Bawtenheimer,63 Ohio St. 3d at 266. The failure to honor a properly served subpoena[2] cannot, in and of itself, constitute the assertion of the Fifth Amendment privilege against self-incrimination,[3]
as such action would run afoul of an accused's right to compulsory process. Moreover, since the Fifth Amendment privilege is a personal one, only Matheson could assert it upon specific questions proffered either by Hayley's lawyer or the state.Bawtenheimer, 63 Ohio St.3d at 264; In re Morganroth,718 F.2d at 167. Although we conclude that the judge improperly asserted the privilege in the absence of Matheson, and without the proffer of specific questions,[4] we are precluded from finding error.
As noted above, an accused's constitutional right of compulsory process is limited by the rules of evidence. E.g., Denis,117 Ohio App.3d at 446. The record lacks any indication of the specific information, or the evidentiary relevance of the information, Hayley's lawyer sought to elicit from Matheson. In order to properly preserve an assignment of error regarding a ruling which excludes evidence, the proponent must make an offer of proof of the evidence unless it is apparent from the record. Evid.R. 103 (A) (2); State v. Brooks (1989), 44 Ohio St.3d 185,195, 542 N.E.2d 636; see State v. Grubb (1986), 28 Ohio St.3d 199, 503 N.E.2d 142, paragraph two of the syllabus. The record discloses only that Matheson's testimony would be "germane" despite the admission by Hayley's lawyer that he did not know what Matheson would say. Because the proposed evidence has not been made part of the record, nor is it discernable from the record, this Court may not find error. Evid.R. 103 (A) (2).
We also note that the 11th hour subpoena contributed to the difficulty faced by the judge when she considered whether to allow the defense to call Matheson as a witness. The state filed its witness list, sans Steve Matheson, and hand-delivered it to Hayley's lawyer on May 6, 1998 — eight days before trial. If Hayley's lawyer had planned to call Matheson, he could have issued a subpoena in advance of trial rather than rely upon the state to do so. We overrule Hayley's second assignment of error.
 III. WHEN THE TRIAL COURT INFORMED THE DEFENDANT ONLY OF THE PRISON TERN, AND ADDED IN THE JOURNAL ENTRY THAT THE SENTENCE INCLUDES ALL EXTENSIONS PROVIDED BY LAW, IT FAILED TO COMPLY WITH R.C. 2929.19, WHICH REQUIRES THAT AT SENTENCING FOR AN OFFENSE THAT OCCURRED ON OR AFTER JULY 1, 1996, THE TRIAL COURT SHALL NOTIFY THE OFFENDER OF SPECIFIC FACTS CONCERNING A MANDATORY PERIOD OF POST-RELEASE CONTROL (R.C. 2967.28) AND THE POSSIBILITY OF AN INCREASE IN THE PRISON TERM (R.C. 2967.11).
Hayley argues and the state concedes that the judge erred when she failed to advise, on the record during the sentencing, of all extensions of her sentence provided by law, including both post-release control, pursuant to R.C. 2967.28, and the possibility of an increase in her prison term ("bad time"), pursuant to R.C.2967.11. In accordance with our opinion in State v. Davis (June 18, 1998), Cuyahoga App. No. 72820, unreported, we reverse Hayley's sentence and remand for re-sentencing to comply with the mandatory notification requirements of R.C. 2929.19 (B) (3).
It is ordered that the appellant recover from appellee her costs herein taxed.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JOHN T. PATTON, J., CONCUR; JAMES M. PORTER, A.J.,CONCURRING IN JUDGMENT ONLY.
 ________________________ JUDGE ANNE L. KILBANE
[1] A motion for forfeiture filed by the state on April 9, 1998 sets the amount of money in Hayley's possession at $167.
[2] The record shows that the subpoena was properly served on May 15, 1998.
[3] It can, however, constitute contempt of court. Crim.R. 17 (G).
[4] See In re Rebecca S. (Oct. 31, 1997), Lucas App. No. L-96-377, unreported, (the judge erred when he allowed the witnesses' attorneys to invoke a blanket privilege on their behalf without specific questions being put to them); see, also,Kirk, 72 Ohio St.3d at 567 (where the judge informed the proposed witness of the substance of the testimony sought to be elicited by defense counsel and advised the witness of his Fifth Amendment privilege against self-incrimination, the judge properly precluded the defense from calling the witness to the stand when the witness stated that he will invoke his Fifth Amendment privilege).