OPINION
{¶ 1} Plaintiff-appellant Claudia Kleeman appeals from a summary judgment rendered against her on claims for breach of fiduciary duty and false statement. Kleeman is a member of defendant-appellee Carriage Trace, Inc., a non-profit condominium association (Association). Kleeman sued the Association and nine *Page 2 
individual board members, seeking a declaratory judgment that Restated Declarations of the Association were void. Kleeman also claimed that board members William Brock and Kathy Rice were liable for false statements in connection with the adoption of the Restated Declarations, and that all the board members had violated their fiduciary duty by authorizing certain expenditures.
 {¶ 2} The trial court found that Kleeman was entitled to a declaratory judgment that the Restated Declarations were invalid because thirteen powers of attorney that had been signed were no longer valid by the time the Restated Declarations were executed. However, the court also concluded that the board members had complied with fiduciary duties by acting in good faith. The court further found that Brock and Rice were not liable for false statements because they had no intent to deceive anyone. And finally, the court held that Kleeman's request for an accounting was moot, given the ruling on the claims for breach of fiduciary duties.
 {¶ 3} Kleeman contends that the trial court erred in granting summary judgment against her, but does not challenge the court's ruling on the declaratory judgment issue. Kleeman raises eight assignments of error, which are all without merit. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 4} The Master Agreement for the Association was filed with the Montgomery County Recorder in 1979. This agreement was entered into by Carriage Trace Management Corporation (Corporation), Carriage South (Developer), and the owners of at least 75% of the condominium units in Carriage Trace Condominiums. The Master *Page 3 
Agreement itself was an amendment of prior articles and regulations, to accommodate the Developer's desire to develop additional units on property located adjacent to the existing condominiums.
 {¶ 5} The 1979 Master Agreement included the agreement itself and various attachments referenced in the Agreement, including Exhibit A (List of Owners and Mortgagees); Exhibit B (Amended Articles of Incorporation); Exhibit D (Master Amendment and Declaration); and Exhibit D-5 (Association By-Laws). Among other things, the Master Agreement provided that the owners were members of a corporation (the Association) that the Developer had formed to own and administer certain property for the benefit of the members. The Master Agreement also substituted its bylaws and amended articles of incorporation for those of prior agreements filed in 1974.
 {¶ 6} The Master Amendment and Declaration (Declaration) portion of the Master Agreement defines "Common Areas and Facilities" as "all the Condominium Property except that which is specifically defined and referred to as a unit." Exhibit D, Section(1)(C). "Condominium Property" is further defined as "land, all buildings, improvements and structures on the land, all easements, rights and appurtenances belonging to the land, and all articles of personal property submitted to the provisions of Chapter 5311 of the Ohio Revised Code" by the Declaration and any amendments. Id. at Section (1)(K).
 {¶ 7} A "Unit Owner" is defined as "a person who owns a Condominium Ownership Interest in a Unit." Id. at Section (1)(O). Under the Declaration, each "Unit Owner" owns an undivided interest in the Common Areas and Facilities, which include all areas located on the Condominium Property. The percentage of ownership, and also *Page 4 
responsibility for contributing to upkeep and maintenance, is based on the fair market value of each unit compared to the aggregate fair market value of all units on the date the Declaration was filed for record. Id. at Section 9.
 {¶ 8} Section 12 of the Declaration indicates that the Association is to administer the Condominium Property. Upon acquisition of a unit, each Unit Owner becomes a member in the Association. However, the Declaration provides that "membership shall terminate upon the sale or other disposition by such member of Condominium Ownership Interest, at which time the new Owner of such Unit automatically shall become a member of the Association." Id. at Section 12(A).
 {¶ 9} Under the Agreement, the Association is responsible for maintenance, repairs, alterations, and improvements. However, before obsolete property can be rehabilitated and renewed, the Association is required to obtain an affirmative vote of 75% of the voting power. Id. at Section 18. The same percentage of the voting power is also required to amend the Declaration and By-laws. Id. at Section 13.
 {¶ 10} The Declarations provide that assessments for maintenance must be made in the manner provided in the Declarations and By-laws. Owners are liable for their proportionate share of common expenses, and liens may be placed on an owner's property for unpaid expenses. Id. at Section 20(A) and (D).
 {¶ 11} The By-Laws establish a "Unit Owner's Association" for administration of the Condominium Property. As in the Declarations, the By-laws provide that each owner will automatically become an association member upon acquisition of title to a unit, and that membership terminates upon sale or other disposition of the unit. Exhibit D-5, Section 1(B). Although the ownership interests vary depending on the fair market value *Page 5 
of the property, each unit nonetheless is entitled to one vote. The Association is controlled by a Board of Managers (Board), which consists of nine members who are elected by the Unit Owners.
 {¶ 12} When the Master Agreement was executed in 1979, the original complex consisted of 224 units, and the Developer wished to develop 32 more units. The Association had the power to pay for the care of common areas and facilities, including landscaping, maintenance, and repair, but could not authorize any structural alterations, capital additions to, or capital improvements to common areas costing more than $1,000 without the prior approval of two-thirds of the Association members. Exhibit D-5, Section 4(A)(2) and(B).
 {¶ 13} The Association was required to keep correct and complete books and records of account specifying receipts and expenditures. In addition, the By-laws provided for an audit at least every three years by an Independent Registered or Certified Public Accountant. Id. at Section 5(G).
 {¶ 14} In April, 1991, a ninth amendment to the Master Agreement was filed with the County Recorder. This document increased the amounts that could be expended on capital improvements to $3,500. It also changed the requirement that audits be conducted, by substituting the word "review" in place of "audit."
 {¶ 15} This controversy had its origin in 2000, when the Unit Owners were asked to sign power of attorney forms, giving the Association's Board the power to replace the Master Agreement with Restated Declarations. The purpose of amendment was to simplify and update the declarations. A table was set up for this purpose in the clubhouse at Carriage Trace on election day in the year 2000. When people came in to *Page 6 
sign the power of attorney, they were asked if they owned property at Carriage Trace. The Board members taking signatures were required to obtain the unit number of the property. They then looked up the number to verify that the individual lived there. In addition, Diane Herbst made sure that individuals were eligible to sign and notarized their signatures on the powers of attorney. Herbst had been the manager of Carriage Trace for many years and knew all the Owners in the complex.
 {¶ 16} The Restated Declarations were drafted by a special committee of three people: Dick Hartzell, James Walker, and Diane Herbst. In December, 2000, Walker reported to the Board that there were sufficient signatures to satisfy the 75% requirement for approval. Walker and Herbst had counted the signatures personally and had satisfied themselves that there were enough. The special committee then drafted the Restated Declarations after the vote authorizing the changes, and gave the document to the Association's attorney, Hans Soltau, for review. Following a number of revisions, the Restated Declarations were executed by Defendants-appellees William Brock and Kathy Rice on behalf of the Association in December, 2001. The Restated Declarations were then filed with the Montgomery County Recorder in January, 2002.
 {¶ 17} The Restated Declarations continued the Board's ability to make structural alterations or capital improvements in common areas up to $3,500 without obtaining the consent of the Unit Owners. The requirement of a 75% affirmative vote for renewal and rehabilitation of obsolete property was retained.
 {¶ 18} In the amended By-Laws, which are part of the Restated Declarations, the ability to request a review was placed in the hands of lending institutions that held certain percentages of the mortgages on the Units. This was considered a typographical *Page 7 
error that had originated in Soltau's office, as the Board did not intend to make financial reviews contingent upon the request of mortgage lenders. The error was discovered after the Restated Declarations were filed. Consequently, a corrective amendment was then filed, indicating that the Association's financial records would be reviewed every three years.
 {¶ 19} In August, 2002, the Board spent $2,345.33 to trim trees that were located along a boulevard median that was the primary means of ingress and egress to the Carriage Trace community. The Board had been trimming the trees and maintaining the median since Carriage Trace's inception in 1974, and Board members were unaware in August, 2002, that the City of Centerville was actually responsible for maintaining the median.
 {¶ 20} Subsequently, during October and November, 2002, the Association spent $2,975 to repair and install speed bumps within the complex. The installation of new speed bumps was based on complaints from residents about speeding on the roadways by delivery personnel, residents, and visitors.
 {¶ 21} In March, 2003, the Board also approved the expenditure of over $19,000 on improvements to the south-side tennis court area. At the time, these tennis courts were rarely used, needed repairs, and were considered an eyesore by some residents. The courts were located on a 0.833 acre parcel of property that had been deeded to the Association from Carriage Trace Management Inc. (formerly Carriage Trace Management Corporation) in September, 2001. The quit-claim deed transferring the property was signed by William Brock, who was the Board President at the time. Due to the transfer, the tennis courts were located on Association property, rather than *Page 8 
Condominium Property.
 {¶ 22} The Board authorized the alteration of the tennis courts to green space because it felt the change was in the Association's best interests. The Board had also received an opinion from the Association's attorney, who stated that Board did not need to seek approval from the Owners to make the improvement.
 {¶ 23} Kleeman moved into Carriage Trace in 1991. Upon becoming dissatisfied with the Board's action on the above matters, Kleeman instituted the present lawsuit in October, 2003, raising claims for breach of fiduciary duty, declaratory judgment, and false statement. After the parties filed cross motions for summary judgment, the trial court found that Kleeman was entitled to a declaration that the Restated Declarations were invalid because thirteen votes had not been validly cast, reducing the percentage of consenting owners below 75%. The reason for this is that the parties signing the powers of attorney had sold their condominium units between the time they signed and the date that the Restated Declarations were executed in December, 2001.
 {¶ 24} The court also found, however, that the Board members had complied with their fiduciary duties because there was no evidence that the members had acted in bad faith by trimming trees, replacing and adding speed bumps, and removing the tennis courts. The court further found that Rice and Brock were not liable for false statements because they had no intent to deceive anyone when they certified that the appropriate number of Unit Owner votes had been obtained. Finally, the court rejected Kleeman's request for an accounting, because Kleeman did not move into the condominium until 1991. At that time, the Ninth Amendment to the Master Agreement required only a review every three years. The court also found Kleeman's request moot, since she did *Page 9 
not succeed on her claims for breach of fiduciary duty.
 {¶ 25} Kleeman appeals from the judgment of the trial court, raising eight assignments of error.
 II {¶ 26} For purposes of convenience, we will address the assignments of error out of order. In addition, we will combine our discussion of the second, third, and fourth assignments of error, since they are related. Kleeman's Second Assignment of Error is as follows:
 {¶ 27} "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE PLAINTIFF/ APPELLANT BY RULING THAT THE DEFENDANTS/APPELLEES DID NOT BREACH THEIR COMMON LAW FIDUCIARY DUTY TO THE CONDOMINIUM OWNERS."
 {¶ 28} Kleeman's Third Assignment of Error is as follows:
 {¶ 29} "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE PLAINTIFF/ APPELLANT BY RULING THAT THE DEFENDANT/APPELLEES DID NOT BREACH THE STATUTORY DUTY OWED TO THE CONDOMINIUM UNIT OWNERS PURSUANT TO R.C. 1702.30(D)(1)."
 {¶ 30} Kleeman's Fourth Assignment of Error is as follows:
 {¶ 31} "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE PLAINTIFF/ APPELLANT BY RULING THAT THE DEFENDANT/APPELLEES WERE SHIELDED BY THE AFFIRMATIVE DEFENSE OF ADVICE OF COUNSEL."
 {¶ 32} Before addressing the assignments of error, we note that:
 {¶ 33} "A trial court may grant a moving party summary judgment pursuant to Civ. *Page 10 
R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." Smith v. Five RiversMetroParks (1999), 134 Ohio App.3d 754, 760, 732 N.E.2d 422. We review decisions granting summary judgment de novo, which means that we apply the same standards as the trial court. Broadnax v. Greene CreditService (1997), 118 Ohio App.3d 881, 887, 694 N.E.2d 167, and Long v.Tokai Bank of California (1996), 114 Ohio App.3d 116, 119,682 N.E.2d 1052.
 {¶ 34} Under the second and third assignments of error, Kleeman contends that the Board had both a common law and statutory fiduciary duty to act in the best interests of the condominium owners. Kleeman relies on Behm v. Victory Lane Unit Owners' Assn., Inc. (1999),133 Ohio App.3d 484, 728 N.E.2d 1093, in which the First District Court of Appeals found that R.C. 5311.14(A) and the declarations of a homeowner's association imposed a fiduciary duty on the association and board to maintain common areas. 133 Ohio App.3d at 487. According to the First District, this duty requires boards to exercise authority "in the best interests of the homeowners." Id. at n. 5.
 {¶ 35} R.C. 5311.14(A) fails to mention "fiduciary duty" and says only that damages to common areas must be "promptly repaired." This may impose a duty of prompt repair, but that is different from imposing a relationship of "special confidence and trust." 133 Ohio App.3d at 487, n. 5. We do agree with the First District that a particular condominium development may choose to establish a fiduciary duty in its declarations. However, choosing to include a fiduciary duty in the declarations is *Page 11 
different from concluding that a fiduciary duty arises under a specific statute or under common law.
 {¶ 36} During its discussion, Behm quoted a definition of a fiduciary relationship that was used in Belvedere Condominium Unit Owners' Assn.v. R.E. Roark Cos., Inc., 67 Ohio St.3d 274, 280, 1993-Ohio-119,617 N.E.2d 1075. Behm, 133 Ohio App.3d at 487, n. 5. Belvedere involved the issue of whether condominium developers owe a fiduciary duty to condominium associations. This issue is somewhat different from the duty of a board to association members, but the Ohio Supreme Court's comments on R.C. Chap. 5311 and the common law are instructive.
 {¶ 37} The Ohio Supreme Court began its discussion inBelvedere by noting that Ohio's first condominium act was enacted in 1963, and recognized condominiums as a form of real property for the first time under Ohio law. 67 Ohio St.3d at 279. The condominium act was codified in R.C. Chap. 5311 and addressed a number of matters, including the creation of the cooperative form of condominium ownership, the respective interests of owners in common areas, and condominium administration. Id.
 {¶ 38} In Belvedere, the condominium association had argued that the developer owed a fiduciary duty to the association under common law and under Chap. 5311. However, the Ohio Supreme Court rejected the idea of a common law fiduciary duty, stating that "Ohio most certainly has no `ancient and settled system' of condominium law." Id. at 282. The court stressed that:
 {¶ 39} "the Ohio Condominium Act and the 1978 amendments to the Act created relationships, rights, and remedies that did not exist at common law. The scope of the Act convinces us that it was meant to comprehensively define and regulate the law of *Page 12 
condominium development, including the legal relationship between condominium developers and unit owners' associations." Id. (Italics in original.)
 {¶ 40} In view of the Ohio Supreme Court's comments inBelvedere, we conclude that boards of condominium associations are not charged under the common law with a fiduciary duty to their members. Furthermore, the Ohio Supreme Court went on to discuss the "central issue" in the case, which was "whether the Act [R.C. Chap. 5311] creates a fiduciary relationship between condominium developers and unit owners' associations." Id. After discussing the content of R.C. Chapter 5311 in detail, the court ultimately held that R.C. Chapter 5311 does not create a fiduciary duty because it does not mention the concept of fiduciary duty. Id. at 283.
 {¶ 41} The Ohio Supreme Court noted in Belvedere that one of the new requirements in Chapter 5311 is "the creation of unit owners' associations to administer condominium property." Id. at 280. These associations are authorized by R.C. 5311.08, which also provides that a board of directors is to administer "all power and authority" of the association. Id. According to the Ohio Supreme Court, an "owners' association acts as a `quasi-government entity paralleling in almost every case the powers, duties, and responsibilities of a municipal government.'" Id. (Citation omitted.)
 {¶ 42} By analogy, one might conclude that elected officers in this "quasi-government entity" owe fiduciary duties to their "constituents," since public officials are considered fiduciaries, at least with respect to funds entrusted to their care. See, e.g., State v. McKelvey (1967),12 Ohio St.2d 92, 95, 232 N.E.2d 391, and State v. Gaul (1997),117 Ohio App.3d 839, 850, 691 N.E.2d 760. Without specifically mentioning the concept of fiduciary duty, the Tenth District has also concluded that board managers *Page 13 
should adopt rules and make decisions in "`good faith for the common welfare of the owners and occupants of the condominium.'"Worthinglen Condominium Unit Owners' Assn. v. Brown (1989),57 Ohio App.3d 73, 76, 566 N.E.2d 1275.
 {¶ 43} We do not disagree with either the First or Tenth Districts that a duty of good faith may be owed. However, resort to a common law duty is unnecessary, since R.C. 1702.30 outlines fiduciary duties that apply to boards of directors of non-profit corporations.[1]
 {¶ 44} Regarding the duties of directors, R.C. 1702.30(B) states that:
 {¶ 45} "A director shall perform the duties of a director, including the duties as a member of any committee of the directors upon which the director may serve, in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances. In performing the duties of a director, a director is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, that are prepared or presented by the following:
 {¶ 46} "(1) One or more directors, officers, or employees of the corporation who the director reasonably believes are reliable and competent in the matters prepared or presented;
 {¶ 47} "(2) Counsel, public accountants, or other persons as to matters that the *Page 14 
director reasonably believes are within the person's professional or expert competence;
 {¶ 48} "(3) A committee of the directors upon which the director does not serve, duly established in accordance with a provision of the articles or the regulations, as to matters within its designated authority, which committee the director reasonably believes to merit confidence."
 {¶ 49} Subsection (C) of R.C. 1702.30 further provides that:
 {¶ 50} "For purposes of division (B) of this section:
 {¶ 51} "(1) A director shall not be found to have failed to perform the director's duties in accordance with that division, unless it is proved, by clear and convincing evidence, in an action brought against the director that the director has not acted in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, or with the care that an ordinarily prudent person in a like position would use under similar circumstances. * * *
 {¶ 52} "* * *
 {¶ 53} "(2) A director shall not be considered to be acting in good faith if the director has knowledge concerning the matter in question that would cause reliance on information, opinions, reports, or statements that are prepared or presented by the persons described in divisions (B)(1) to (3) of this section, to be unwarranted."
 {¶ 54} And finally, R.C. 1702.30(D)(1) states, in pertinent part, that:
 {¶ 55} "a director is liable in damages for any act that the director takes or fails to take as director only if it is proved, by clear and convincing evidence, in a court with jurisdiction that the act or omission of the director was one undertaken with a deliberate intent to cause injury to the corporation or was one undertaken with a reckless disregard *Page 15 
for the best interests of the corporation."
 {¶ 56} The undisputed facts in the present case indicate that the board's actions in gathering signatures for the Restated Declarations, trimming trees in the median, installing speed bumps, and removing the tennis courts were taken in good faith and in a manner the directors reasonably believed to be in the best interests of the Association. The board members also acted with the care that ordinarily prudent persons in like positions would use under similar circumstances, and with no intent to cause injury or with reckless disregard for the best interests of the Association.
 {¶ 57} With regard to the gathering of signatures on the powers of attorney, the Board members reasonably believed they had the correct number of signatures and that the signatures were of persons who owned the units and were authorized to sign. In particular, the board members relied on Herbst, who had been the condominium manager for about twenty-two years, and who knew all the Unit Owners in the complex. The committee members who were responsible for drafting the Revised Declarations also believed that the Association members had approved the content of the Revised Declarations by signing the powers of attorney. There was no evidence that any Board or committee members were aware of a need to verify ownership again before executing the Revised Declarations. Notably, the individuals on the Board and drafting committee were unpaid volunteers, and were operating under the impression that their actions were authorized. Although the trial court ultimately concluded that the required number of signatures did not exist at the time the Restated Declarations were executed, due to units having been sold in the interim, there is no evidence in the record that the Board's actions were taken in bad faith. There is also no evidence of deliberate intent to injure *Page 16 
or reckless disregard.
 {¶ 58} The least difficult standard to prove in this situation would have been reckless disregard, which has been defined as "as a perverse disregard of a known risk." Hancock v. Ashenhurst, Franklin App. No. 03AP-1163, 2004-Ohio-3319, at If 11. However, as we said, the undisputed evidence as to the drafting and filing of the Revised Declarations reveals no perverse disregard of the best interests of the Association.
 {¶ 59} Regarding the trimming of trees in the median and the speed bumps, the undisputed evidence indicates that these items each involved expenditures of less than $3,500. The Association had maintained the median area for nearly thirty years without incident, and Board members believed it was their obligation to trim the trees. The expenditure being questioned was made before the Board learned that the median strip belonged to the City of Centerville. When the Board did learn that Centerville owned the median, it also learned that Centerville would not maintain the median in the desired fashion. Maintaining the median area in an aesthetically pleasing manner would enhance the economic value of the owners of units in the condominium, regardless of the fact that Centerville owned the median. Therefore, the board's choice to trim the trees and to continue maintaining the median thereafter was done in good faith. There is also no evidence of deliberate intent to harm or reckless disregard.
 {¶ 60} Finally, with regard to the tennis courts, the undisputed evidence indicates that there were complaints from residents about the appearance of the courts, which were not used and had fallen into disrepair. Before substituting green space for the courts, the Board investigated alternatives. The Board also consulted its attorney, Hans *Page 17 
Soltau, and was informed that the Board did not need to obtain approval from the Owners, because the courts were located on land belonging to the Association rather than the Owners. Soltau had handled legal matters for the Board on various occasions for many years, and testified that the parcel of land on which the tennis courts sat was a separate 0.833 acre parcel, which had not been included as part of the common area in 1979 because part of the parcel may have been needed for an easement or for the expressway. In October, 2001, the parcel was deeded to the Association. This was well before the decision was made to remove the tennis courts. The transfer was simply a house-keeping measure that was done for tax purposes, because the tax bills were being sent to the developer, who was defunct. In addition, Soltau told the Board that it would not need the Owners' approval to remove the courts, even if the courts had been located on common property.
 {¶ 61} Under the undisputed facts, there is no evidence of bad faith, reckless disregard or deliberate intent to harm the Owners' rights. The Board's actions with regard to the removal of the tennis courts were taken in good faith, were based on the information the Board then possessed, and were done in accordance with the advice of counsel. The Board had no reason to question the advice given by its attorney.
 {¶ 62} In arguing that the Board has failed to establish the "affirmative defense of advice of counsel," Kleeman contends that the Board failed to furnish its attorney with the material fact that the tennis courts would be replaced with "poorly maintained grass and trees." Kleeman also claims that the Board did not consult with its attorney at all regarding the initial transfer of the tennis court property to the Association, nor with regard to the tree-trimming and installation of speed bumps. *Page 18 
 {¶ 63} As a preliminary point, we note that "advice of counsel" is an affirmative defense to charges of malicious prosecution. See Francis v.Cleveland (1992), 78 Ohio App.3d 593, 597, 605 N.E.2d 966. There is no indication under Ohio law that advice of counsel is considered an "affirmative defense" to claims of breach of fiduciary duty. The cases Kleeman cites all involve actions brought for malicious prosecution. See, e.g., Killilea v. Sears, Roebuck Co. (1985), 27 Ohio App.3d 163,168, 499 N.E.2d 1291 (action for malicious prosecution brought against department store and store security officer, in which defense of advice of counsel was raised).
 {¶ 64} R.C. 1702.30 also does not designate advice of counsel as an affirmative defense to a non-profit director's breach of fiduciary duty. Instead, R.C. 1702.30(B) simply states that when directors of a non-profit corporations, like the Association, perform their duties, they are entitled to rely on information, opinions, and statements presented by various parties, including other directors, officers, or employees of the corporation, counsel, public accountants, other professional or expert persons, and committees on which the directors do not personally sit. This does not appear to be an affirmative defense and it is not labeled as one. Instead, these statements in R.C.1702.30(B) appear to be a statutory recognition that board members must typically rely on information and counsel from all types of sources, without independently verifying the accuracy of the facts or advice. Compare Celebrezze v. Variety Club Tent No. 6 Charities Inc. (Oct. 28, 1992), Lorain App. No. 92CA005279, 1992 WL 316354, *2 (president of non-profit club relied in good faith on treasurer's oral report of bingo revenues, as president was entitled under R.C. 1702.30 to rely on reports of treasurer and data prepared by accountants and attorneys hired by the club. The president had *Page 19 
no reason to suspect that treasurer and operator of bingo game were improperly carrying out their responsibilities). This type of reliance is inherent in being an executive, since executives generally make decisions after reviewing data that is collected or prepared by others.
 {¶ 65} An affirmative defense is "a new matter [that], assuming the complaint to be true, constitutes a defense to it." State ex rel. ThePlain Dealer Publishing Co. v. Cleveland (1996), 75 Ohio St.3d 31, 33,661 N.E.2d 187. For purposes of the present case, that would mean an admission by the Board that it acted wrongfully in removing the tennis courts. However, the Board never admitted that its actions were wrongful. The Board maintained that it did not need to ask permission from the Unit Owners.
 {¶ 66} Assuming for the sake of argument that advice of counsel was properly an affirmative defense, we conclude, nevertheless, that Kleeman's argument is without merit. With omissions for matters pertinent only to malicious prosecution claims, the defense of "advice of counsel" requires a defendant to prove that "he in fact, sought the advice of counsel, that he fairly and impartially informed counsel of all the material facts * * * and that he followed counsel's advice in good faith." Killilea, 27 Ohio App.3d at 168 (citations omitted).
 {¶ 67} Contrary to Kleeman's contention, the Board did not omit material facts when it presented this matter to its attorney. The Board's attorney, Soltau, was aware of all material facts when he rendered advice about the tennis courts.
 {¶ 68} As a preliminary point, we note that Kleeman incorrectly focuses on whether the Board sought Soltau's advice before transferring the tennis court property to the Association in 2001. As we indicated, there was no demonstration that the property *Page 20 
transfer was done in bad faith. To the contrary, the only evidence that was submitted to the trial court is that the transfer was a housekeeping measure, done to ensure that tax notices were received. When Soltau advised the Board in March, 2003, that it did not need to seek permission from the Unit Owners before replacing the tennis courts, Soltau was well aware that the property had been transferred to the Association in 2001. In fact, his opinion was based on that fact.[2]
 {¶ 69} Kleeman also contends that the Board failed to tell Soltau that the tennis courts would be replaced with poorly maintained grass or trees. There is no evidence in the record that this is a "fact." Paul Kleeman, the husband of plaintiff-appellant Claudia Kleeman, filed an affidavit in August, 2005, stating that the area formerly occupied by the tennis courts was "now covered with poorly maintained grass and is an eyesore." However, that fact, even if true, has no bearing on what was in the minds of Board members two years earlier, when they voted to remove the tennis courts that were in disrepair. The only evidence on this point is that residents had complained about the tennis courts and the Board concluded, after considering various alternatives, that the best approach was to remove the courts and convert the area to green space.
 {¶ 70} As a final matter, we note that the Board did not claim to have sought advice from its attorney before deciding to trim trees or install speed bumps. There is no evidence that these items were considered anything other than routine maintenance, done to preserve the appearance and safety of the condominium complex.
 {¶ 71} Based on the preceding discussion, the second, third and fourth *Page 21 
assignments of error are overruled.
 III {¶ 72} The Fifth Assignment of Error is as follows:
 {¶ 73} "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE PLAINTIFF/ APPELLANT BY RULING THAT THE DEFENDANT/APPELLEES ARE NOT LIABLE FOR THEIR FALSE STATEMENTS PURSUANT TO R.C. 1702.54(A)(1)."
 {¶ 74} Defendants-appellees William Brock and Kathy Rice executed the Revised Declarations in December, 2001, on behalf of the 193 consenting Unit Owners. The Revised Declarations were then filed with the Montgomery County Recorder. Kleeman alleged in the trial court that Brock and Rice made false statements and violated R.C. 1702.54(A)(1) by certifying that the Restated Declarations were executed pursuant to powers of attorney for the consenting owners. The trial court rendered summary judgment in favor of Brock and Rice, finding that Kleeman had presented no evidence of intent to deceive.
 {¶ 75} Kleeman contends that the trial court erred and that a jury question exists because Rice did not take steps to satisfy herself regarding the adequacy of the number of signatures, and because Brock and Rice were aware, through their positions on the Board, of property transfers within the condominium. The most that might be said of a failure to take steps to verify the number of signatures is that it was negligent. In this regard, however, we have previously noted that the Board properly relied on Herbst, who knew all the Unit Owners in the complex. Furthermore, there is no evidence that Rice and Brock were aware of property transfers within the complex, or even if they did, that *Page 22 
this knowledge would have made a difference. Both Brock and Rice testified that they believed the signed powers of attorney authorized the project from start to finish and included the ability to complete the Restated Declarations. Brock and Rice both also testified that they had no intent to deceive anyone. Kleeman offered no evidence to challenge these statements.
 {¶ 76} R.C. 1702.54(A) provides that:
 {¶ 77} "No officer, director, employee, or agent of a corporation shall, either alone or with another or others, with intent to deceive:
 {¶ 78} "(1) Make, issue, deliver, transmit by mail, or publish any prospectus, report, circular, certificate, statement, balance sheet, exhibit, or document, respecting membership rights in, or the activities, assets, liabilities, earnings, or accounts of, a corporation, that is false in any material respect, knowing the same to be false."
 {¶ 79} The trial court correctly concluded that Kleeman failed to present evidence to show that Brock or Rice had an intent to deceive anyone. Compare McDaniel v. Kipton Settler Day Festival (Jan. 1, 1991), Lorain App. No. 90CA994839, 1991 WL 2005, *2 (finding that the trial court was correct in holding officers of a non-profit corporation liable under R.C. 1702.54(A), as the officers had testified that when they issued a check to a vendor, they knew the corporation did not have sufficient funds to satisfy the check).
 {¶ 80} The Fifth Assignment of Error is overruled.
 IV {¶ 81} The Sixth Assignment of Error is as follows:
 {¶ 82} "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE PLAINTIFF/ *Page 23 
APPELLANT BY RULING THAT THE CLAIMS AGAINST JAMES WALKER SHOULD BE DISMISSED."
 {¶ 83} The trial court dismissed James Walker as a defendant because Walker had presented undisputed evidence that he was not a Board member at the times relevant to Kleeman's causes of action. Kleeman does not dispute this fact, but contends that Walker should have been deemed a "trustee" of the Association under R.C. 1702.01(L) because Walker chaired the committee to update the Declarations, helped draft the Restated Declarations, and advised the Board in December, 2000, that there were enough signatures on the power of attorney forms.
 {¶ 84} R.C. 1702.01 was amended in April, 2001, before some events at issue in this litigation, but after others. As pertinent to this case, however, the only effect of the amendment was to renumber former section "(L)" as "(K)" and to substitute the word "director" for the word "trustee." Therefore, we will refer to the current version of the statute, which provides that "`Directors' means the persons vested with the authority to conduct the affairs of the corporation irrespective of the name, such as trustees, by which they are designated."
 {¶ 85} There is scant Ohio case law mentioning or discussing R.C.1702.01(K). Where this subsection has been mentioned, it has generally involved matters such as whether a particular party has standing to bring an action. For example, in Polish Army Veterans Assn. of America,Inc. v. Polish Veterans Alliance, Inc. (Aug. 15, 1978), Cuyahoga App. No. 37282, 1978 WL 217944, *3, the court considered whether individual plaintiffs, who were minority voting members, had standing to bring an action on behalf of a non-profit corporation. Citing R.C. 1702.30(A) and R.C. 1702.01(K), *Page 24 
which vested authority in the corporation's trustees (now directors), the court held that the plaintiffs lacked standing because they were not persons vested with authority to conduct the affairs of the corporation.
 {¶ 86} The other statute mentioned in Polish Army Veterans (R.C.1702.30) provides that "[e]xcept where the law, the articles, or the regulations require that action be otherwise authorized or taken, all of the authority of a corporation shall be exercised by or under the direction of its directors. For their own government, the directors may adopt bylaws that are not inconsistent with the articles or the regulations." R.C. 1702.30(A).
 {¶ 87} We do not interpret these sections to provide that persons serving on committees are deemed "directors" of a non-profit corporation for purposes of a lawsuit. R.C. 1702.30(A), in particular, recognizes that the directors may adopt rules for their own government, so long as ultimate authority rests in the Board.
 {¶ 88} Consistently with R.C. 1702.01(K) and R.C. 1702.30(A), Section 12 of the Master Amendment and Declarations in the Master Agreement provides for exercise of all corporate powers by a Board of Managers and officers who are elected as provided by the By-laws.[3] Section 2 of the By-laws also indicates that the affairs of the Association are to be governed by the Board of Managers elected by the members of the Association. In turn, the Board officers are to be selected from among the members of the Board. The By-laws also allow the Board to delegate duties to others as the *Page 25 
Board specifies, but this does not mean that corporate authority is being asserted by these persons. This is simply a recognition that the Board may require assistance from time to time by persons or organizations who are not on the Board. Therefore, the Board could ask a non-Board member to serve on a committee assisting the Board without also clothing that individual with the Board's authority to conduct the affairs of the corporation. Notably, Walker was not the individual who executed and filed the Restated Declarations. These actions were taken by Board members. Walker was simply performing actions at the behest of the Board, and was answerable to the Board.
 {¶ 89} However, even if Walker could be deemed a "director" under R.C.1702.01(K) and R.C. 1702.30(A), he would be entitled to the same protection that the Board members had under R.C. 1702.30(B) and (D). As we noted, the record is devoid of evidence indicating that the Board acted in bad faith, with deliberate intent to injure, or with reckless disregard for the best interests of the Association. Accordingly, even if the trial court had erred in dismissing the claims against Walker for the reasons stated, there is no evidence to support any claims against Walker.
 {¶ 90} For the reasons just mentioned, however, we agree with the trial court that Walker was not properly sued, since there was no evidence that he exercised the authority of the Association at the times in question. Accordingly, the Sixth Assignment of Error is overruled.
 V {¶ 91} Kleeman's Seventh Assignment of Error is as follows:
 {¶ 92} "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE PLAINTIFF/ APPELLANT BY RULING THAT THE DEFENDANT/APPELLEES WERE NOT *Page 26 
REQUIRED TO PAY THE COSTS OF DRAFTING AND FILING RESTATED DECLARATIONS."
 {¶ 93} The trial court found that the Restated Declarations were not validly adopted because thirteen of the 193 signing Unit Owners had sold their properties before the Restated Declarations were executed in December, 2001. The court also found that the powers of attorney executed by current residents of Carriage Trace were valid. Because the 180 valid signatures did not meet the percentage needed for amendment (75%), the court granted Kleeman's request for a declaratory judgment that the Restated Declarations were void. The court refused, however, to require the Board to pay for the cost of drafting and filing another set of declarations.
 {¶ 94} Kleeman contends that the trial court had the ability to award affirmative or negative relief under R.C. 2721.02(A), and should have awarded the cost of redrafting, based on the Board's reckless actions. However, Kleeman's argument depends on the premise that the Board's actions were reckless. We have rejected that premise.
 {¶ 95} The grant or denial of declaratory judgments is reviewed under an abuse-of-discretion standard. Mid-American Fire and Cas. Co. v.Heasley, 2007-Ohio-1248, 113 Ohio St.3d 133, 137, 863 N.E.2d 142, atIf 14. "`An abuse of discretion connotes a decision that is unreasonable, arbitrary or unconscionable.'" State ex rel. Askew v.Goldhart, 75 Ohio St.3d 608, 610, 1996-Ohio-448, 665 N.E.2d 200
(citations omitted). Because the record reveals no evidence that the trial court acted unreasonably, arbitrarily, or unconscionably, the Seventh Assignment of Error is overruled.
 VI *Page 27 {¶ 96} Kleeman's Eighth Assignment of Error is as follows:
 {¶ 97} "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE PLAINTIFF/ APPELLANT BY RULING THAT SHE MUST PAY COSTS NOTWITHSTANDING THE FACT THAT SHE IS THE PREVAILING PARTY."
 {¶ 98} Under this assignment of error, Kleeman contends that the trial court erred in requiring her to pay costs, even though she was the prevailing party. In response, the Board argues that the decision on costs was a proper exercise of discretion because Kleeman prevailed on only a minor point.
 {¶ 99} Civ. R. 54(D) provides that "costs shall be allowed to the prevailing party unless the court otherwise directs." The Ohio Supreme Court has interpreted the phrase "unless the court otherwise directs" to mean that the court does not have power to award costs to a non-prevailing party. Vance v. Roedersheimer 64 Ohio St.3d 552, 555,1992-Ohio-24, 597 N.E.2d 153. We review the trial court's award of costs for abuse of discretion. See, e.g., State ex rel. Reyna v.Natalucci-Persichetti, 83 Ohio St.3d 194, 198, 1998-Ohio-129,699 N.E.2d 76.
 {¶ 100} Civ. R. 54(D) does not define "prevailing party." Typically, a prevailing party is "`one in whose favor the decision or verdict is rendered and judgment entered.'" Hagemeyer v. Sadowski (1993),86 Ohio App.3d 563, 566, 621 N.E.2d 707 (citations omitted). Federal courts have interpreted "prevailing party" under Fed. Civ. R. 54(d) to mean "a party who has obtained some relief in an action, even if that party has not sustained all of his or her claims* * *." However, federal courts have also held that "under Rule 54(d) the `prevailing party' is the party who prevails `as to the substantial part of the litigation.'" FirstCommodity Traders, Inc. v. Heinold *Page 28 Commodities, Inc. (C.A. 7, 1985), 766 F.2d 1007, 1015 (citations omitted).[4] The Ohio Supreme Court has employed a similar analysis with regard to awarding attorney fees under a statute that allows an award of attorney fees to a "prevailing party" but does not define the term. See Parker v. I F Insulation Co., 89 Ohio St.3d 261, 264,2000-Ohio-151, 730 N.E.2d 972 (holding that a "party `prevails' on appeal within the meaning of R.C. 1345.09(F) if it obtains a substantial modification of the trial court's judgment").
 {¶ 101} In the present case, the trial court did not explain its reasons for awarding costs to the Board. However, the trial court's summary judgment decision indicates that the court found little merit to Kleeman's claims. Kleeman did receive a finding on declaratory judgment that the Restated Declarations were void, but this judgment did nothing to advance the gist of Kleeman's case, which was that the Board had violated fiduciary duties with regard to various expenditures that were made. Compare Landefeld v. State Medical Bd. of Ohio (June 15, 2000), Franklin App. No. 99AP-612, 2000 WL 767606, *8 (finding that the trial court did not abuse its discretion in ordering costs to be paid by a litigant who prevailed on some points but did not prevail on the main issue in the case).
 {¶ 102} The trial court in the present case dismissed the majority of Kleeman's claims, while finding in Kleeman's favor on only one claim. Therefore, Kleeman did not prevail as to a substantial part of her litigation.
 {¶ 103} Under the circumstances, we find no abuse of discretion in the award of costs to the Board and individual Board members. Accordingly, the Eighth *Page 29 
Assignment of Error is overruled.
 VII {¶ 104} Kleeman's First Assignment of Error is as follows:
 {¶ 105} "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE PLAINTIFF/ APPELLANT BY RULING THAT SHE WAS NOT ENTITLED TO AN AUDIT OF THE BOOKS."
 {¶ 106} The trial court denied Kleeman's request for an audit for several reasons. First, the court found that Kleeman was not entitled to an audit for the years 1981 through 1990 because Kleeman did not purchase her property until 1991. The court also rejected the request for an audit thereafter because the Ninth Amendment to the Master Agreement, filed in 1991, called only for a "review." Finally, the court found that the request for an audit was moot because it was connected to the claims for breach of fiduciary duty, which had been rejected.
 {¶ 107} In contending that the trial court erred, Kleeman relies on R.C. 1702.15, which requires non-profit corporations to keep records and to allow any member or director to examine all books and records of the corporation. The Board's response is that Kleeman never raised R.C.1702.15 in the trial court and should precluded from raising the issue at this point. The Board also argues that Kleeman never asked the trial court for an accounting in her request for declaratory relief, and never raised an equitable action for an accounting in the complaint. Instead, Kleeman asked the court only for an injunction prohibiting the Board from spending any further funds until an audit could be conducted. *Page 30 
 {¶ 108} We agree with the Board and the trial court. As an initial matter, we note that Kleeman did not establish the precise date of her deed. The testimony of both Kleeman and her husband reveals only that the condominium was purchased at some unspecified point in 1991.
 {¶ 109} From 1979 until April, 1991, the Master Agreement provided for an audit of the Association's books at least every three years. On April 5, 1991, a Ninth Amendment to the Master Agreement was executed and notarized, changing the audit requirement to that of a review. The Ninth Amendment was filed with the Montgomery County Recorder on April 10, 1991.
 {¶ 110} Kleeman contends in her appellate brief that she purchased the condominium on April 5, 1991, but she has failed to cite any reference in the record for this assertion. The only references we have found in the record indicate merely that the property was purchased in the year 1991. Therefore, Kleeman failed to prove that she was an owner at the time an audit was required.[5]
 {¶ 111} In any event, since 1991, the Association has only been required to review its books every three years, not to conduct an audit. Therefore, even if Kleeman had requested an audit in the trial court, or prior to fling suit, the Association was under no obligation to comply. *Page 31 
 {¶ 112} More importantly — as the trial court found — the request for an audit was connected to Kleeman's claims for breach of fiduciary duty. The complaint contains three claims for relief: declaratory judgment, breach of fiduciary duty, and false statement. There is no separate claim for an accounting or an audit, and the only time an audit is mentioned is in the prayer for relief, which asks for an injunction prohibiting the Board from spending further funds until an audit could be conducted. The expenditure of funds was linked to the claim that the Board had breached its fiduciary duty by spending money on trimming trees, installing speed bumps, and replacing the tennis courts. Furthermore, Kleeman did not even request an audit, but requested an injunction. Since Kleeman's claim for breach of fiduciary duty has been rejected, the request for an injunction pending an audit is moot. As a final matter, even if Kleeman had raised R.C. 1702.15 below, it would not have afforded a basis for relief. R.C. 1702.15 provides that:
 {¶ 113} "Each corporation shall keep correct and complete books and records of account, together with minutes of the proceedings of its incorporators, members, directors, and committees of the directors or members. Subject to limitations prescribed in the articles or the regulations upon the right of members of a corporation to examine the books and records, all books and records of a corporation, including the membership records prescribed by section 1702.13 of the Revised Code, may be examined by any member or director or the agent or attorney of either, for any reasonable and proper purpose and at any reasonable time."
 {¶ 114} This section simply gives members a right to inspect the books and records of the corporation — it does not require an audit. In her deposition, Kleeman *Page 32 
testified that she had never asked the Association if she could inspect its financial documents. Kleeman deposition, p. 97. Accordingly, even if Kleeman had raised R.C. 1702.15 in the trial court, there would have been no basis on which the trial court could have granted judgment.
 {¶ 115} The First Assignment of Error is overruled.
 VIII {¶ 116} All of Kleeman's assignments of error having been overruled, the judgment of the trial court is Affirmed.
Brogan and Donovan, JJ., concur.
[1] The parties in this case agree that the Association is a non-profit corporation and that the Board is subject to R.C. 1702.30. Therefore, we do not need to resort to the common law or R.C. Chapter 5311 to find a fiduciary duty on the part of the Board.
[2] Notably, Soltau also told the Board that it did not need to seek permission from the Owners, even if the tennis courts were located in the common area.
[3] We are referring to the Master Agreement rather than the Restated Declarations because the trial court found that the Restated Declarations did not have the necessary number of signatures. This finding has not been contested on appeal.
[4] Fed. Civ. R. 54(d) is virtually identical to Ohio Civ. R. 54(D).
[5] Assuming for the sake of argument that Kleeman did purchase her condominium on April 5, 1991, this is the same date that the 1991 amendment was executed. Condominium documents are "agreements between the owners and are essentially contractual." Recknagel v. Board ofManagers of Edenwood Condominium Owners Assn. (Mar. 9, 1983), Clark App. No. 36983, 1983 WL 4850, *3. Therefore, at the time Kleeman purchased her condominium, the contract requirement had been changed to a review. *Page 1